Ferris F. and Mary Ann S. HAMILTON

v.

The UNITED STATES.

Frederic C. and Jane M. HAMILTON

v.

The UNITED STATES.

HAMILTON BROTHERS PETROLEUM
CORPORATION

v.

The UNITED STATES.

Nos. 460 79T, 461 79T and 179 80T.

United States Court of Claims.

Aug. 25, 1982.

Buford P. Berry, Dallas, Tex., attorney of record, for plaintiffs. Thompson & Knight, Dallas, Tex., of counsel.

Ellen C. Specker, Washington, D. C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and SMITH, Judges.

ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

SMITH, Judge:

Plaintiffs claim income tax refunds for 1969 on grounds that the Internal Revenue Service (Service) improperly interpreted the partnership agreements of certain partnerships [1] of which Ferris and Frederic Hamilton [2] were the general partners. Defendant contends that certain allocation provisions in the agreements created nonrecourse loans to plaintiffs from the limited partners of each of the partnerships in question. Defendant contends further that the allocation provisions of the partnership agreements lack economic substance apart from their tax consequences and should not be recognized. Therefore, defendant claims a proper allocation of partnership income and expenses, made according to the substance of the agreements, results in additional taxable income to plaintiffs. Finally, defendant contends that when the partnerships were incorporated into Hamilton Brothers Petroleum Corporation (the corporation), the above-mentioned loans were discharged and plaintiffs recognized a taxable gain to the extent that the outstanding loans exceeded plaintiffs' bases in the partnership interests transferred.[3]

We find no validity to defendant's "loan" theory in this case and hold that the part-

1. Ferris and Frederic Hamilton were general partners in 17 partnerships at one time or another in 1969. However, we are concerned here only with the following partnerships: Hamilton Oil and Gas Company, Ltd., Hamilton Oil and Gas Company, Ltd. (1962), Hamilton Oil and Gas Company, Ltd. (1964), and Hamilton Brothers Petroleum Company, Ltd. (1967).

2. Mary Ann S. Hamilton and Jane M. Hamilton are parties to this case solely because they filed joint tax returns with their husbands. Hamilton Brothers Petroleum Corporation is not affected by the issues in this case. Therefore, the term "plaintiffs" in this opinion will refer only to Ferris F. Hamilton and Frederic C. Hamilton.

3. Restated in (we hope) simpler language, defendant's contention is that, although in *form* plaintiffs obtained a 5 percent initial partnership interest by contributing 5 percent of the capital, in *substance* plaintiffs obtained a 40 percent interest, deriving 5 percent from a contribution of their own funds and 35 percent from a contribution of funds obtained "in the nature of a loan" from the limited partners. The additional taxable income to plaintiffs is derived (1) from attribution to plaintiffs, rather than to the limited partners, of the income distributions based on such 35 percent, and (2) from discharge of plaintiffs' "nonrecourse obligations in the nature of loans," when plaintiffs' partnership interests, having a lower basis than the discharged "loans," were transferred in exchange for corporate stock.

nership agreements have economic substance. Therefore, we grant plaintiffs' motion for partial summary judgment.

The facts in this case can be briefly stated since our inquiry focuses almost solely on the specific terms of the partnership agreements in question. Defendant does not argue that the actions of plaintiffs departed in any measure from the rights and obligations set out in the agreements.[4]

Plaintiffs, calendar year, cash-basis taxpayers, have been directly and actively engaged for many years in the business of exploring for and producing oil, gas, and other minerals. They have conducted this business through numerous oil and gas exploratory programs in the form of partnerships and joint ventures. Such programs have undertaken geophysical and geological investigations, the acquisition of interests in oil and gas properties, and the drilling of exploratory and development wells in the search for oil and gas reserves. Various individuals and companies have participated with plaintiffs in these programs as partners or joint venturers.

The first limited partnership of which plaintiffs served as general partners, Hamilton Brothers, Ltd., was formed in 1956. That partnership agreement provided that the limited partners would be allocated 85 percent of partnership income and operating expenses and 90 percent of acquisition, development, and equipment costs with respect to each drilling block until 85 percent of the income from such drilling block equaled 90 percent of the acquisition, development, and equipment costs for such drilling block, at which time the limited partners' share of income and operating expenses would be reduced to 70 percent. The general partners were allocated the remaining 15 percent, 10 percent, and 30 percent, respectively, of such income, costs, and expenses. Although the percentages vary among the partnerships, similar allocations are contained in substantially all agreements for the oil and gas limited partnerships formed through the year 1969 of which plaintiffs were general partners, including all 17 partnerships in existence in 1969 and at issue in these cases.

The partnership agreement of that first partnership, Hamilton Brothers, Ltd., was the subject of a favorable 1957 private letter ruling.[5] Another limited partnership, Hamilton Oil and Gas Company, Ltd., was the subject of a favorable 1967 private letter ruling. Hamilton Oil and Gas Company, Ltd., was formed in 1967 through a merger of Hamilton Oil Company, Ltd. (1960), Hamilton Gas Company, Ltd. (1960), and Hamilton Oil and Gas Company, Ltd.

In 1969, plaintiffs, as general partners, and other individuals and companies transferred substantially all of their partnership interests in the partnerships in question to the corporation in exchange for stock and notes of the corporation in a transaction reported for tax purposes under section 351 of the Internal Revenue Code.[6] The final

---

4. All facts in this opinion have been taken from the parties' stipulation of facts. Although some of the parties' arguments are not discussed, we have fully considered all of them.

5. As of January 1, 1968, Hamilton Brothers, Ltd., was merged into Hamilton Oil and Gas Company, Ltd., one of the partnerships at issue.

6. 26 U.S.C. § 351 (1976) provides, in part:

"§ 351. Transfer to corporation controlled by transfer[or]

"(a) General rule

"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

"(b) Receipt of property

"If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

"(1) gain (if any) to such recipient shall be recognized, but not in excess of—

"(A) the amount of money received, plus

"(B) the fair market value of such other property received; and

"(2) no loss to such recipient shall be recognized.

"(c) Special rule

determination of the number and types of shares of stock in the corporation to be issued to the various partners for their respective partnership interests was premised on a determination of what the partners considered to be the underlying exchange value of their partnership interests. The exchange value for the interest of each partner was the dollar value placed on his interest as of January 1, 1969.[7] On the basis of such values the transaction was consummated. The exchange value for each partnership was as follows:

| Partnership | Exchange Value |
|---|---|
| Hamilton Oil and Gas Company, Ltd. | $28,327,978.06 |
| Hamilton Oil and Gas Company, Ltd. (1962) | 5,610,495.68 |
| Hamilton Oil and Gas Company, Ltd. (1964) | 20,838,707.09 |
| Hamilton Brothers Petroleum Company, Ltd. (1967) | 10,370,080.65 |
| | $65,147,261.48 |

We focus our inquiry in this case on the allocation provisions of the partnership agreements in question. While the percentages of income and expenses allocated between the general partners (plaintiffs) and the limited partners differ to a minor extent among the agreements, the mechanics of the provisions function identically. The relevant sections of one of the agreements are set forth in an appendix to this opinion.

"In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in the exchange to its shareholders shall not be taken into account.
"(d) Exception
"This section shall not apply to a transfer of property to an investment company."

7. Prior to January 1, 1969, the limited partners of Hamilton Oil and Gas Company, Ltd., had received cash distributions in excess of their cash contributions, and therefore, income and expense items were being allocated in accordance with the partnership interest percentages as provided in paragraph VI–C of the partnership agreement. Accordingly, the exchange value of that partnership was allocated among the partners on the basis of the partnership interest percentages provided in paragraph VI–C. (See partnership agreement in appendix.)
The exchange value allocated to Hamilton Brothers Petroleum Company, Ltd. (1967), was less than the total amount of the unrecovered cash contributions of the limited partners as of

In a requested 1977 Technical Advice Memorandum [8] the Service analyzed the provisions of the agreements and came to the conclusion that the allocations therein of income, losses, deductions, and credits were inconsistent with the economic substance of the arrangements and, therefore, should not be recognized for tax purposes. The memorandum, and the parties in their briefs, used a modified statement of facts for a single partnership in order to demonstrate the mechanics of the provisions of the agreements. We shall also use that statement of facts in order that the key issues in this case are not lost in a maze of numbers. Furthermore, the terms which shall be used throughout the opinion are defined in the following discussion.

In the facts of the memorandum, plaintiffs contributed 5 percent of the capital of the partnership, with the limited partners contributing the remaining 95 percent. All income, expenses, and losses were allocated in proportion to the partners' capital contributions until the limited partners recovered their contributions. (This "payout" provision is contained in paragraph VI–B of the agreement set forth in the appendix.) After that sum was recovered, the allocations for all income, expenses, and losses shifted to 40 percent for the general partners and 60 percent for the limited partners. (This

January 1, 1969. Accordingly, the entire exchange value was allocated pursuant to the provisions of paragraph VI–B of the partnership agreement.
The amount of unrecovered cash contributions of the limited partners of Hamilton Oil and Gas Company, Ltd. (1962), and Hamilton Oil and Gas Company, Ltd. (1964), was calculated and a portion of the exchange value of each partnership equal to these unrecovered cash contributions was allocated first between the general partners and the limited partners on the basis of the provisions of paragraph VI–B of the partnership agreements for these partnerships. The remaining amount of the exchange value of each partnership was then allocated to each partner in accordance with the partnership interest percentages provided in paragraph VI–C of his respective partnership agreement.

8. Tech.Advice Memo. 7707260880A (July 26, 1977).

"shift" provision, sometimes referred to as a "flip-flop," is contained in paragraph VI–A of the agreement.) Prior to the "payout," the general partners could, but were not required to, accelerate the shift to the 40/60 allocation by using their own funds to pay the limited partners a specified portion of the limited partners' unrecovered capital contributions.[9] (This "buyout" provision is contained in paragraph VI–C of the agreement.) If the partnership should be liquidated prior to payout, plaintiffs would receive 40 percent of the partnership assets subject to the right of the limited partners to recover first a proportionate share of their investment in the form of a "net profits interest." The "net profits interest" was to be paid only out of income from the assets or from the proceeds from the sale of the assets. Plaintiffs incurred no personal liability for the "net profits interest." (This "liquidation" provision is contained in paragraph VI–E of the agreement.)

Defendant argues, under alternative theories, that the terms of the agreement gave plaintiffs a 40 percent interest in the profit and losses from the start of the partnership. Defendant's first theory proposes that plaintiffs' initial contribution to the partnership equaled 40 percent of its capital, 5 percent from plaintiffs' own funds and 35 percent from a nonrecourse loan from the limited partners. Defendant's second theory proposes that plaintiffs initially contributed 5 percent of the capital of the partnership but the limited partners immediately transferred a share of their interests to plaintiffs in exchange for an equal amount of nonrecourse debt, thereby increasing plaintiffs' capital interest to 40 percent. If either of these recharacterizations is accepted, the agreement's allocation of 95 percent of the partnership's losses to the limited partners lacks economic substance since the percentage of the losses allocated to the limited partners would exceed their 60 percent share of the capital of the partnership.

Plaintiffs argue that defendant's characterization of the provisions totally distorts the manner in which the partnerships operate. Plaintiffs further argue that example 5 of Treas.Reg. § 1.704–1(b)(2), along with other examples under that regulation section and several revenue rulings, supports the validity of the partnership agreements. Finally, plaintiffs argue that the 1957 and 1967 private letter rulings protect certain "successor" partnerships from challenge.

I.

Partnerships are "special animals" in the Internal Revenue Code (code). They, unlike other entities, are not income taxpayers.[10] Instead, they are conduits through which a group of individual taxpayers (individual in the sense of being singular) engage in activities which have income tax consequences for each taxpayer.[11]

The code gives partners great latitude in selecting the form the partnership takes and how the economic benefits and burdens are allocated among the partners.[12] Part-

---

9. The specified sum is arrived at by dividing the difference between plaintiffs' 40 percent profits interest and 5 percent capital contribution by the limited partners' 95 percent capital contribution:

$$\frac{40\text{-}5}{95} = 0.368421$$

10. 26 U.S.C. § 701 (1976) provides:

"§ 701. Partners, not partnership, subject to tax

"A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities."

*See Blitzer v. United States*, 684 F.2d 784 (Ct.Cl.1982).

11. On the issue whether the partnership is an entity or a conduit, the Supreme Court has stated:

" * * * The legislative history indicates, and the commentators agree, that partnerships are entities for purposes of calculating and filing informational returns but that they are conduits through which the taxpaying obligation passes to the individual partners in accord with their distributive shares. * * *" *United States v. Basye*, 410 U.S. 441, 448 n.8, 93 S.Ct. 1080, 1085 n.8, 35 L.Ed.2d 412 (1973).

12. 26 U.S.C. § 704 (1970), as in effect for the tax year, 1969, in question, provides in part:

nership allocations take two basic forms. One, the allocation of net income or loss generated by activities of the partnership is commonly referred to as a "bottom-line allocation." Two, the allocation of a specific item of income, loss, deduction, or credit to a partner is commonly referred to as a "special allocation." The only major limitation placed on the partners' apportionment of income, losses, deductions, and credits is that allocations must conform to a bona fide business purpose and not be used for tax avoidance purposes. This limitation is necessary in order to prevent tax sensitive taxpayers from entering into partnerships with non-tax sensitive taxpayers and, within the terms of the partnership agreement, allocating income, losses, etc., on the basis of who has the lowest marginal tax cost on income received or who has the highest marginal tax benefit for losses and deductions taken. In this case, defendant argues that plaintiffs' partnership agreements violate the limitation.

From the outset, we are faced with conflicting positions by defendant. Defendant argues at one point that it is challenging plaintiffs' bottom-line allocation of income and losses. At another point, defendant argues that it is challenging plaintiffs' special allocations of items of income, losses, deductions, and credits. These conflicting positions create a problem for the court in analyzing the validity of the provisions of the agreements. It is clear that if a pre-1976 bottom-line allocation is at issue, the test for validity found in section 704(b)(2) and Treas.Reg. § 1.704–1(b)(2) is not applicable.

Courts [13] have held that the section 704(b)(2) phrase "with respect to the partner's *distributive share of such item * * *"* limits the scope of that section.[14] (Emphasis supplied.) Those courts concluded that "such item" refers only to special allocations delineated in subsections (1)–(8) of the 1969 version of section 702, thus excepting the allowance for bottom-line allocations found in subsection (9).[15]

Pre-1976 bottom-line allocations are, therefore, subject to a different standard, although in the end the test is similar to that of section 704(b)(2). The standard for bottom-line allocations is drawn from the

---

"§ 704. Partner's distributive share.

"(a) Effect of partnership agreement.

"A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

"(b) Distributive share determined by income or loss ratio.

"A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

"(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

"(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item *is the avoidance or evasion of any tax imposed by this subtitle.*"

In 1976, section 704(b)(2) was amended, Tax Reform Act of 1976, Pub.L.No.94–455, § 709, 90 Stat. 1520, 1548, to read:

"(2) [T]he allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect."

**13.** *See Boynton v. Commissioner,* 649 F.2d 1168 (5th Cir. 1981), *cert. denied,* 102 S.Ct. 1009 (1982); *Holladay v. Commissioner,* 649 F.2d 1176 (5th Cir. 1981). *But see Rodman v. Commissioner,* 542 F.2d 845 (2d Cir. 1976).

**14.** 26 U.S.C. § 704(b)(2) (1970), *supra* note 12. In order to bring bottom-line allocations within its ambit, section 704(b)(2) was amended to include the phrase "income, gain, loss, deduction, or credit (or item thereof)."

**15.** 26 U.S.C. § 702(a) (1970) states, in pertinent part:

"§ 702. Income and credits of partner.

"(a) General rule.

"In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

\* \* \* \* \* \*

"(8) other items of income, gain, loss, deduction, or credit, to the extent provided by regulations prescribed by the Secretary or his delegate, and

"(9) taxable income or loss, exclusive of items requiring separate computation under other paragraphs of this subsection."

opinion in *Kresser v. Commissioner*.[16] In *Kresser*, the Tax Court held that for bottom-line allocations to be given effect they must accurately reflect the economic substance of the parties' agreement. The Tax Court expanded upon this standard in its opinion in *Boynton v. Commissioner*,[17] when it stated that the *Kresser* test is based on the doctrine that the substance, not the form, of a transaction determines its tax implications. The *Boynton* court restated the *Kresser* standard and held that [18]

> in construing the partnership agreement, the formula which *they* [the partners] select for actually dividing profits and apportioning losses among themselves will be determinative of their "distributive" shares, rather than a different formula arbitrarily included in the agreement which is to be applicable only for the purpose of filing income tax returns, and which is to have no legal consequences in respect of their rights against one another. * * * [Emphasis in the original.]

As we have stated, special allocations of items of income, losses, deductions, and credits are subject to the limitations found in section 704(b)(2) and Treas.Reg. § 1.704–1(b)(2). Section 704(b)(2), as in effect in 1969, states that if the principal purpose of a special allocation of an item is the avoidance or evasion of any tax imposed, the partner's distributive share of such item will be made in accordance with the distributive share (bottom-line allocation) of taxable income or loss of the partnership. Treasury Regulation § 1.704–1(b)(2) expands on this concept and provides, in pertinent part:

> In determining whether the principal purpose of any provision in the partnership agreement for a special allocation is the avoidance or evasion of Federal income tax, the provision must be considered in relation to all the surrounding facts and circumstances. Among the relevant circumstances are the following:

Whether the partnership or a partner individually has a business purpose for the allocation; *whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences;* whether related items of income, gain, loss, deduction, or credit from the same sources are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. * * * [Emphasis supplied.]

■ The italicized section of the regulation is the key factor to be considered in any analysis of the viability of a special allocation. An allocation that lacks "substantial economic effect" will not be saved by meeting the other five factors in the regulation, and it is unlikely that an allocation that has "substantial economic effect" would not also meet the other factors.

The allocations that defendant has challenged in this case are clearly bottom-line allocations. Therefore, since this case concerns a pre-1976 tax year, the *Kresser-Boynton* standard developed by the Tax Court is applicable. However, that standard differs only slightly from the standard found in section 704(b)(2) and the use of one rather than the other should have little effect on the outcome of this case.

## II.

Defendant's case rests upon the proposition that while plaintiffs' own funds comprised only 5 percent of the capital invested in the partnerships in question, plaintiffs should also be credited with an additional 35 percent of capital investment in each

---

**16.** *Kresser v. Commissioner*, 54 T.C. 1621 (1970).

**17.** *Boynton v. Commissioner*, 72 T.C. 1147 (1979), *aff'd*, 649 F.2d 1168 (5th Cir. 1981), *cert.*

*denied*, 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982).

**18.** *Id.*, 72 T.C. at 1159.

partnership by way of a nonrecourse loan from the limited partners in each of the partnerships. Defendant's novel argument evolves from its idea that the "net profits interest" assigned to the limited partners under the liquidation provision of the agreement is not "an interest in the assets of the partnership" which is properly allocable to the limited partners.[19] Defendant concludes from this "fact" that the limited partners must have "loaned" plaintiffs, on a nonrecourse basis, 35 percent of the total capital investment in the partnership, thus giving plaintiffs a 40 percent interest in the partnership from its beginning. For reasons we need not discuss, defendant argues that the contingent nature of the "loan" limits the manner in which it may be added to the bases of plaintiffs' partnership interests. From this, defendant concludes that the partnership agreement's payment provision is invalid since the limited partners received a 95 percent share of the bottom-line allocations while their "real" economic interest comprised only a 60 percent share.

In the following discussion, we consider the rationale of example 5 of Treas. Reg. § 1.704–1(b)(2), several revenue rulings, and the applicable case law and we conclude that defendant's "loan" argument must be rejected.

Example 5 of Treas.Reg. § 1.704–1(b)(2) states:

Example (5). G and H, each of whom is engaged as a sole proprietor in the business of developing and marketing electronic devices, enter into a partnership agreement to develop and market electronic devices. H contributes $2,500 cash and agrees to devote his full-time services to the partnership. G contributes $100,000 cash and agrees to obtain a loan for the partnership of any additional capital needed. The partnership agreement provides that the full amount of any research and experimental expenditures and any interest on partnership loans are to be charged to G. It also provides that G's distributive share is to be 90 percent of partnership income or loss computed without reduction by such research and experimental expenditures and such interest, until all loans have been repaid and G has received through his 90 percent share of income an amount equal to the full amount of such research and experimental expenditures, of such interest, and his share of any partnership operating losses. During this time H's distributive share will be 10 percent. Thereafter, G and H will share profits and losses equally. Since all of the research and experimental expenditures and interest specially allocated to G are in fact borne by G, the allocation will be recognized in the absence of other circumstances showing that its principal purpose was tax avoidance or evasion.

Plaintiffs argue that since the limited partners' initial contribution to the partnership capital equaled 95 percent of the total capital investment, they were entitled, according to the example's analysis, to 95 percent of the initial costs and income generated by the activities of the partnerships. Plaintiffs further argue that the shift to a 40/60 allocation following the recoupment of the partners' investment is clearly allowed by the logic of the example.

Defendant argues that the example's analysis is not applicable to this case because the last sentence in the example, *i.e.*, "in the absence of other circumstances showing that its principal purpose was tax avoidance or evasion" limits the relevancy of the example to agreements which have

---

**19.** Treas.Reg. § 1.704–1(e)(1)(v) (1960) provides:

"(v) Capital interest in a partnership. For purposes of section 704(e), a capital interest in a partnership means an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his withdrawal from the partnership or upon liquidation of the partnership. The mere right to participate in the earnings and profits of a partnership is not a capital interest in the partnership."

This regulation that defendant cites is specifically limited to the apportionment of profit and capital interests in a "family partnership." The code and regulations do not have a general definition of a "partnership capital interest."

liquidation provisions that expressly follow the partners' capital accounts.[20] This argument is highly suspect. It is clear that factually the "payout" and "shift" provisions in the instant case operate the same as the "payout" and "shift" provisions in the example. Defendant's claim that plaintiffs received a nonrecourse loan from the limited partners is hard to reconcile with the failure of example 5 to raise such a possibility. The most satisfactory explanation is that in neither pattern of allocations was a loan made from one partner to another. However, we do not hold that every partnership agreement which follows the form of example 5 is valid but rather hold that defendant's "loan" theories are in conflict with the clear thrust of the example.

Several revenue rulings also call into question defendant's "loan" theories. Revenue Ruling 68–139,[21] like example 5, contains a set of facts directly analogous to the present case. Revenue Ruling 68–139 states, in pertinent part:

The parties, A, B, and C, entered into a partnership agreement for the joint exploration of oil and gas in which B and C were required to contribute 300x dollars, each, to be used for drilling and equipping the first test well for which B and C each received a 3/32d working interest in the leases for their contributions. A retained the remaining 26/32d working interest. The contributions were to be paid, one-half by B and one-half by C, as follows: (a) 300x dollars upon the first test well reaching 3,500 feet and (b) 300x dollars upon the first test well reaching 7,500 feet or 1,000 feet above the top of a specified formation, or to a depth which encountered commercial production.

Partner A commenced drilling the test well and soon thereafter B and C each contributed their 300x dollars, all of which was expended in drilling the well and was sufficient to complete it.

\* \* \* \* \* \*

The partnership agreement provided that all items of cost were to be allocated to the partners in accordance with their portion of the contributions to the respective items of cost. In determining contributions to intangible drilling and development costs, the initial payments of B and C made pursuant to the partnership agreement, would, to the extent so expended, represent their respective contributions to the intangible drilling and development costs incurred by the partnership.

[The ruling states the substance of code sections 263(c), 704(a), 704(b), and Treas. Reg. § 1.704–1(b)(2).]

\* \* \* \* \* \*

Accordingly, the provisions of the partnership agreement to allocate the intangible drilling and development costs incurred by the partnership will be recognized, if a proper election is made by the partnership under sections 1.703–1(b)(1) and 1.612–4 of the regulations to deduct intangible drilling and development costs, unless examination discloses that the principal purpose of the allocation is the avoidance or evasion of Federal income tax.

Again, we cannot accept defendant's argument that plaintiffs received a loan from their limited partners while partner A in Rev.Rul. 68–139 did not. We do not accept defendant's argument that this ruling is inapplicable to the present case for the reason that the ruling only approves allocations of costs and not allocations of income. The validity of allocations of costs and allocations of income is judged by the same standards. In the present case, the limited partners contributed 95 percent of the initial capital and received 95 percent of the benefits of the enterprise until their contributions were recovered. This apportionment directly follows the logic of the ruling. Furthermore, whatever liquidation rights

---

**20.** We are aware that example 5 and other sources we cite in the opinion relate to the validity of special allocations and not bottom-line allocations. However, we believe that

these sources give insight into the merits of defendant's "loan" theories.

**21.** Rev.Rul. 68–139, 1968–1 C.B. 311.

defendant wishes to assign the money partners in the ruling, it is clear that the economic reality of the ruling and the facts in the present case are not in tune with defendant's loan theories. It is evident that defendant's theories lack economic substance to a greater extent than either plaintiffs' or our reading of the allocation provisions of these partnership agreements. They totally ignore the economic reality that these plaintiffs possessed ability to find oil and gas, and routinely used such limited partnerships as vehicles for their productive enterprises; facts not lost on the investors in these limited partnerships.

The revenue ruling most damaging to defendant's position is Rev.Rul. 72–135.[22] Revenue Ruling 72–135 states, in full:

> *ABC, Ltd.,* is a limited partnership engaged in the acquisition, exploration, development and operation of oil and natural gas properties in which *P* is the general partner. The limited partners are those investors who have subscribed to a public offering of limited partnership interests in *ABC.* The limited partnership agreement provides that *P* may loan, on a nonrecourse basis, to limited partners, a portion of their subscription in *ABC.* The agreement further provides that *P* may make loans, on a nonrecourse basis, to the partnership.
>
> *Held,* in the instant case, a nonrecourse "loan" from the general partner to a limited partner or to the partnership is a contribution to the capital of the partnership by the general partner, rather than a loan, and accordingly, the amount thereof shall be added to the basis of the partnership interest of the general partner and not to the basis of the partnership interest of the limited partner.

Defendant argues that this revenue ruling is not relevant to the present case because the limited partners did not receive additional interests in the partnerships' assets for their "loan." This argument is strained at best. The ruling clearly states that when a partner makes a nonrecourse loan to another partner, secured by property of unknown value, the "lender's"—not the "borrower's"—basis in his partnership interest is increased. The rationale of this ruling rejects any characterization that a portion of a limited partner's capital contribution is a nonrecourse loan to plaintiffs which increases plaintiffs' interest and decreases the limited partner's interest in the partnership. Instead, according to the ruling, if, for argument's sake, a limited partner had advanced a nonrecourse loan to plaintiffs, that loan would not have altered the partners' relative interests in the partnership.[23]

Finally, the relevant case law does not support defendant's theories. The key factor behind any analysis of the validity of a partnership allocation is that the allocation must reflect the true economic substance of the partners' deal. The partners are not allowed to make allocations which are not "genuinely in accord with the actual division of profits and losses inter sese which the partners have in fact agreed upon among themselves." [24] By the same token, defendant is not allowed to characterize the provisions of an agreement in a manner which is contrary to the economic reality of the agreement. Defendant's loan theories run directly counter to the concept developed in prior tax opinions that part-

---

**22.** Rev.Rul. 72–135, 1972–1 C.B. 200.

**23.** *See* Rev.Rul. 72–350, 1972–2 C.B. 394. Rev. Rul. 72–350 concerned a party unrelated to the partnership who made a loan to an oil and gas limited partnership secured only by the partnership's unproven or unsalvageable assets. The ruling holds that the "loan" is, in reality, capital the unrelated party placed at risk in the venture. This ruling also rejects the basic concept behind defendant's "loan" theories. *See also Hambuechen v. Commissioner,* 43 T.C. 90 (1964), in which the Tax Court held that an

equity investment results when a payment of funds is made to a partnership without a reasonable expectation of repayment regardless of the success of the venture. This holding further indicates that the limited partners' investments in the partnership were not loans to plaintiffs but, instead, were capital contributions which should be attributed to the limited partners.

**24.** *Boynton,* 72 T.C. at 1158.

nership expenses are deductible by the partner who bears the economic burden of the expense incurred.[25] Defendant's characterization of a portion of the limited partners' capital contribution as constituting nonrecourse debt does not alter the fact that the limited partners' contributions to the partnerships equaled their total economic burden. That fact also is not altered by defendant's second theory that the limited partners transferred a portion of their interests to plaintiffs for plaintiffs' "payout obligation" to the limited partners.

In conclusion, we hold, in light of our analysis, that defendant's arguments must be rejected.

### III.

Having held that the partnership agreements do not contain implicit "loan" or "transfer of interest" provisions, we now must determine whether the agreements themselves are in accord with the economic reality of the partners' undertaking. The *Kresser-Boynton* standard provides the proper analytical framework upon which to make the determination whether the form of the agreement follows the substance of the partners' allocations of economic benefits and burdens.

Under the agreement, the limited partners provided 95 percent of the initial capital contributions needed for the partnerships' expenses while plaintiffs provided the remaining 5 percent. The partners further agreed that the partnerships' initial cash receipts would be allocated to each partner according to his initial capital contribution. In other words, for each $100 of cash receipts generated by the partnership, the limited partners would receive $95, in accordance with their 95 percent capital contribution, and plaintiffs would receive $5, in accordance with their 5 percent capital contribution. (See paragraph VI–B of the agreement.) This allocation scheme operates to reimburse all the partners for their capital contributions at the same rate, *i.e.*, the last $100 of cash receipts necessary for the reimbursement would allot the limited partners $95 and plaintiffs $5.

■ After the "payout" provision has been fulfilled, the partners agreed that the bottom-line allocation would shift to 40 percent to plaintiffs and 60 percent to the limited partners. (See paragraph VI–A of the agreement.) In other words, once all parties had recovered their capital contributions, the partners agreed that plaintiffs should receive a 40 percent share of the profitable venture. Distributions and taxable income shifted at the same time and to the same extent; thus, the agreements in question fully reflect the economic substance of this portion of the partners' deal.

■ Finally, we reach the main point of contention between defendant and plaintiffs—the liquidation provision of the partnership agreements. Defendant argues that because the liquidation provision allocates a "post-payout" 40 percent share of the assets to plaintiffs, the agreement does not comport with the economic reality of the partners' deal. Plaintiffs assert that the limited partners were allocated their proper proportionate share of the partnerships' assets. Under the terms of the agreements, the limited partners received a direct 60 percent share of the partnerships' assets plus either a share of the proceeds from the sale of the assets or a "net profits interest"—both equal to the limited partners' unrecovered capital contributions, multiplied by the sum of plaintiffs' 40 percent share, minus their 5 percent capital contribution, divided by the limited part-

---

**25.** There must be a "bona fide [allocation] * * of income among the partners." *Kresser*, 54 T.C. at 1631 n.5. "[F]or allocations to be bona fide they must accurately reflect the basis on which [the parties] * * * agreed to share the economic profits and bear the economic losses of the joint venture." *Holladay v. Commissioner*, 72 T.C. 571, 588 (1979), aff'd, 649 F.2d 1176 (5th Cir. 1981). "To find any economic effect of the special allocation agreement aside from its tax consequences, we must, therefore, look to see who is to bear the economic burden of the [expense] * * *." *Orrisch v. Commissioner*, 55 T.C. 395, 403 (1970), aff'd per curiam in an unpublished opinion (9th Cir. 1973, 31 A.F. T.R.2d ¶ 73–1069).

ners' 95 percent capital contribution.[26] We find that a "net profits interest" is an economic interest in the assets similar to a royalty. The Supreme Court stated in a case concerning the oil depletion allowance that [27]

> [i]f the additional payment in these leases had been a portion of the gross receipts from the sale of the oil extracted by the lessees instead of a portion of the net profits, there would have been no doubt as to the economic interest of the lessors in such oil. This would be an oil royalty. The lessors' economic interest in the oil is no less when their right is to share a net profit.  * * *

Therefore, in a "pre-payout" liquidation, each of the partners recover their capital contributions at an equal rate and to an equal degree.[28] For example, if the partnership that we have been using for analysis earned $100 in the first year and then was liquidated, the limited partners would receive $60 (0.60×$100) plus a "net profits interest" equal to $36.84 (0.3684×$100) or $96.84. Plaintiffs would receive the other $3.16. It appears that the "net profits interests" in the actual partnership agreements in question have similar minor mathematical flaws. While these do not precisely equal the limited partners' capital contributions, we do not think the allocations depart from the economic substance of the respective business risks and rewards contemplated by the partners' deals.[29] To hold otherwise would itself be a concession to form over substance.

The validity of a partnership agreement for tax purposes must be determined on a year-by-year basis. Furthermore, while commentators may raise "Rule Against Perpetuities" challenges to an allocation, *i.e.*, if the allocation may be found ineffective for tax purposes under any conceivable set of circumstances, it will be held to be ineffective, our inquiry is limited to what actually transpired in the tax year in question. Based upon the facts presented, we hold that the allocations at issue in this case conform to the economic substance of the partners' agreements and, therefore, a reallocation of plaintiffs' partnership interests is not warranted.[30]

---

**26.** *See* note 9, *supra.* The agreements in question allocate between the partners the income produced from the assets or the proceeds from the sale of the assets; we can think of no other way, except a distribution in kind, to extract the value of partnership assets.

**27.** *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 604, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946).

**28.** *See* note 7, *supra.* Of the former partnerships at issue in this case, all but Hamilton Oil and Gas Company, Ltd., were incorporated prior to "payout." If the "pre-payout" agreements are valid, then the "post-payout" agreement is also.

**29.** The validity of an allocation is tested by examining the effect of the allocation on the capital accounts of the partners at liquidation. This is commonly referred to as the "capital accounts test." This test originated in the Tax Court opinion in *Orrisch, supra* note 25. The plaintiff in *Orrisch* claimed that, according to the legislative history of section 704(b), a special allocation that follows a partner's capital account is valid. The Tax Court agreed that if capital accounts, *i.e.*, the partner's initial cash or property invested as modified by distributions received, later contributions made, and partnership income and losses allocated, were followed, the allocation would be valid. However, because that plaintiff's allocation diverged significantly from his capital account, it was found to be invalid. In *Harris v. Commissioner*, 61 T.C. 770, 786 (1974), the Tax Court stated:

> "[T]he loss allocated to him [the plaintiff] was applied to reduce his capital account, and his share of the related items of future profits, losses, and proceeds in case of liquidation was reduced proportionately. Such an economic impact sharply distinguishes the instant situation from that which obtained in *Stanley C. Orrisch* * * *."

The partners in the instant case were similarly affected. The example demonstrates that plaintiffs and the limited partners would bear the economic loss in proportion to their capital accounts. Even though the "net profits interest" formula has a minor mathematical flaw in it, the agreements have "substantial economic effect."

**30.** Our holding resolves the issues defendant raises concerning the reorganization of the partnerships into the corporation. We need not reach plaintiffs' arguments concerning private letter rulings received by prior partnerships of which plaintiffs were partners. Furthermore, because defendant does not claim that the "buyout" provision was ever utilized

We conclude, after hearing oral argument and considering the parties' submissions, that plaintiffs' cross-motion for partial summary judgment is granted and defendant's motion for partial summary judgment is denied. The cases are returned to the trial division for further proceedings in accordance with this opinion and Rule 131(c).

### APPENDIX

The relevant portions of the Hamilton Oil and Gas Company, Ltd., agreement are as follows:

VI. *Sharing of Interests* : The General and Limited Partners shall share interests in the partnership as follows:

A. Subject to the provisions of Subparagraph B below, the General Partners shall own and hold a 31.86273% interest in the partnership, and the Limited Partners shall own and hold a 68.13727% interest in the partnership. For all purposes under this Agreement, the interest of the General Partners will be divided equally between them. The Limited Partners will share their interest in the percentage interests stated in Columns C, D, and E of Exhibit I, it being understood that the sharing of profits, losses, expenses, income and costs within the Limited Partner Group shall be according to such percentage interests.

B. Until the cash receipts equal to the amounts listed in Column B on Exhibit I hereto are distributed to the Limited Partners, the partnership books, for accounting and income tax purposes, will be kept to reflect the following allocation of items of income, costs, and expense between the General and Limited Partners. The General Partners will be credited with 7.54% of all gross partnership income from properties developed by the partnership; with 7.54% of all gross partnership income from mineral, royalty, overriding royalty and oil payment interests. The General Partners will be credited with 7.54% of all gross receipts from sales of partnership properties when such gross receipts are equal to or

exceed 102.97% of the tax basis of the properties sold. The General Partners will be credited with 4.79% of all gross receipts from sales of partnership properties when such gross receipts are less than 102.97% of the tax basis of the properties sold. The General Partners will be charged with 4.79% of the partnership acquisition, exploration, development, and equipment costs of properties developed by the partnership; with 4.79% of amounts attributed to worthlessness or cost or tax basis of partnership properties sold; with 4.79% of partnership operating costs; and with 4.79% of partnership overhead and interest expenses. [The limited partners are allocated the balance of the income and expenses in each of the above categories.] * * * The partnership depreciation and depletion expenses and allowances will be apportioned 7.54% to the General Partners and 92.46% to the Limited Partners. The partnership intangible drilling and development costs will be apportioned 4.79% to the General Partners and 95.21% to the Limited Partners.

C. When cash receipts equal to the amounts listed in Column B on Exhibit I hereto are distributed to the Limited Partners, all income, expense, loss, and deductions shall be shared and borne 31.86273% by General Partners and 68.13727% by Limited Partners. Under no circumstances shall there ever be a transfer of capital from the account of the Limited Partners to the account or accounts of the General Partners. General Partners shall have the right at any time hereunder to change the allocation percentages between General and Limited Partners as provided in Paragraph VI.B. to the percentages set forth under this Paragraph VI.C. by General Partners paying to the partnership for distribution to Limited Partners in cash 24.90% of the amount of Limited Partners' unrecovered capital contributions at the time of exercise of this right by General Partners. The amount of Limited Partners' unrecovered capital contributions at the time of exercise of such right by General Partners shall be the amounts set forth in Column B of Ex-

by any of the partnerships in question, we do      not consider its validity.

hibit I hereto less the cash receipts distributed to all Limited Partners pursuant to this agreement.

In the event there are partnership liabilities (including but not limited to loans from banks and funds advanced for the partnership by its agent or nominee) at the time the cash receipts equal to the amounts listed in Column B on Exhibit I hereto are distributed to the Limited Partners, the following allocations of income and expense shall be made:

(1) An amount of income equal to 102.97% of the sum of debt retirement and interest expense shall be allocated 92.46% to the Limited Partners and 7.54% to the General Partners.

(2) The interest expense shall be allocated 95.21% to the Limited Partners and 4.79% to the General Partners.

(3) Income and expense after deduction items (1) and (2) above shall be allocated 68.13727% to Limited Partners and 31.86273% to General Partners.

(4) Depletion and depreciation deductions shall be allocated between the 92.46%—7.54% sharing ratio under (1) above and the 68.13727%—31.86273% sharing ratio under (3) above in the same proportion as partnership income is allocated between them.

The income allocated to the Limited Partners for debt retirement and interest expense shall be shared among them in the following manner:

(1) Income allocated for debt retirement and interest expense on partnership liabilities incurred prior to January 1, 1968, shall be shared by the Limited Partners in accordance with the percentages set forth in Column D on Exhibit I.

(2) Income allocated for debt retirement and interest expense on partnership liabilities incurred subsequent to December 31, 1967, and up to the time the Limited Partners recover their capital contributions as provided in Paragraph VI.C. shall be shared by the Limited Partners in accordance with the percentages set forth in Column C on Exhibit I.

When all partnership liabilities are satisfied, the allocations set forth in (1), (2), (3), and (4) first above, shall cease, and all income, expense, loss, and deductions shall be shared and borne 31.86273% by General Partners and 68.13727% by Limited Partners.

\* \* \* \* \* \*

E. Upon the termination of this partnership same shall be dissolved, and the General Partners shall, forthwith upon termination, proceed to wind up the affairs of this partnership. Before any distribution shall be made of any of the partnership assets to any partner, all debts of the partnership shall be paid. Thereafter the General Partners shall cause a distribution to be made of the remaining assets, in kind or in undivided shares, if any, 31.86273% to the General Partners in equal shares and 68.13727% to the Limited Partners: provided, however, if cash receipts equal to the amounts listed in Column B on Exhibit I hereto have not been distributed in full to the Limited Partners, General Partners, in assigning a 31.86273% interest in the partnership properties to themselves, shall reserve unto the Limited Partners a Net Profits interest, in an amount equal to 26.306% of the total by which the amounts listed on Column B of Exhibit I hereto exceeded cash receipts distributed to the Limited Partners hereunder, payable solely out of 76.33476% of the gross income (after production taxes) attributable to the General Partners' said 31.86273% interest in the partnership properties and after deducting from said gross income 84.95603% of the costs and expenses incurred and attributed to the General Partners' 31.86273% interest in said properties. The said reserved Net Profits interest and a 68.13727% interest in the partnership properties shall be distributed to Limited Partners. Nothing herein contained shall be construed as creating a personal liability on General Partners as to the payment of said reserved Net Profits interest, but the same shall be payable only out of production saved and marketed, or out of the proceeds from the sale of assets, from the properties in which said reserved interest is created and not otherwise.

F. Prior to any distribution of assets by the partnership, if such assets include oil and gas leasehold working interests being operated by the partnership, such oil and gas leasehold working interests shall not be distributed unless and until the parties to whom distribution is to be made have executed and delivered such operating agreement or agreements naming General Partners as Operator, and providing for the future management and operation of such leasehold estates. * * *