ESTATE OF Timothy F. CARBERRY, Deceased; Manufacturers Hanover Trust Co.; Ella J. Brady, formerly known as Ella J. Carberry, Executors; Ella J. Brady, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 1245, Docket 90–4137.

United States Court of Appeals, Second Circuit.

Argued March 11, 1991.

Decided May 24, 1991.

Patrick W. Hennessey, Garden City, N.Y., for petitioners-appellants.

Teresa T. Milton, Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Ann B. Durney, Tax Div., Dept. of Justice,

Washington, D.C., on the brief), for respondent-appellee.

Before FEINBERG, NEWMAN and PIERCE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

On this appeal from the July 16, 1990, decision of the Tax Court (Theodore Tannenwald, Jr., Judge), the taxpayers, Timothy F. Carberry and his wife Ella J. Carberry,[1] challenge the disallowance of their deduction for a partnership loss and the application of the penalty interest rate provision to their outstanding taxes. The loss was disallowed upon a finding that a partnership provision for allocation of deductions lacked economic substance. We affirm.

## Facts

### 1. The Tax Filing

The taxpayers filed a joint tax return in 1970 and reported a loss from Timothy Carberry's interest in a partnership, Indonesian Marine Resources ("Indomar"). In 1971, the Carberrys filed a Form 1045 to receive a refund for carrying back the 1970 loss of $44,009 to the 1967 tax year. The carryback was allowed, and the Carberrys received a refund of $23,545. Timothy Carberry died in 1972; his wife and Manufacturers Hanover were named as co-executors and co-trustees of the estate.[2]

In 1973, the IRS selected the Carberrys' 1970 tax return for an audit. On January 4, 1974, prior to the expiration of the statute of limitations for the 1970 tax year and for the net operating loss carryback to 1967, the taxpayers executed, and the IRS accepted, a Form 872, extending the statute of limitations to June 30, 1975. This process was repeated several times, and ultimately the taxpayers filed a Form 872–A extending the statute of limitations for an indefinite period.

On September 10, 1986, the IRS issued a "30-day letter" informing the taxpayers of

1. Now known as Ella J. Brady.

2. Ella Carberry participated individually, and with Manufacturers Hanover as representatives

of Timothy Carberry's estate, in the audit and subsequent litigation. Hereafter, their actions will be referred to as those of the taxpayers.

adjustments to the 1970 return and the 1967 carryback. The IRS sought to disallow a portion of the deduction that the Carberrys had taken for the Indomar partnership loss. The result of the partial disallowance was a deficiency for the 1967 return of $8,698. A notice of deficiency was issued on July 18, 1988, formally notifying the taxpayers of the disallowance, the deficiency, and the interest due on the underpayment of tax. The taxpayers petitioned the Tax Court.

## 2. The Partnership Loss

Independent Indonesian American Petroleum Company ("IIAPCO") entered into an agreement with an Indonesian state oil and gas company whereby IIAPCO agreed to explore for and produce, if possible, oil and gas in an offshore tract near Sumatra. IIAPCO assigned some of its interest under this oil and gas exploration contract to other parties with whom it ultimately formed a partnership. One of these parties, Herbert Dillon, formed his own partnership, Indomar, contributing his interest in the oil and gas exploration rights that he obtained from IIAPCO. Dillon then sought limited partners to contribute capital to Indomar. Timothy Carberry was one of those limited partners.

Subsequently, IIAPCO, in an effort to secure capital to finance the exploratory drilling, formed a partnership with almost all of the parties to whom it had assigned some of its exploration rights. This partnership, Southeast Exploration ("Souex"), was formed in December 1969, and included the following partners with their respective interests: IIAPCO (59%), Carver–Dodge International Company (19.6131%), Warrior International Corporation (7.8452%), and Indomar (13.5417%).

Indomar agreed to contribute $8,750,000 to Souex in return for a 13.5417% partnership interest and a special allocation of the tax deductions produced by the drilling costs. With respect to the allocation of income and expenditures generally, the Souex partnership agreement provided that:

(a) All Partnership income shall be allocated to the Partners in the percentages set forth in paragraph (a) of Article I [IIAPCO 59%, Carver–Dodge 19.6131%, Warrior 7.8452%, and Indomar 13.5417%]....

(b) All deductions and credits shall be allocated to the Partners in the same proportion that they contribute to the expenditures that created such deductions and credits.... Without limiting the generality of the foregoing, all deductions and credits attributable to expenditures representing contributions under paragraph (b) of Article V [Indomar's contributions of not to exceed $8,750,000 to cover "the Partnership's costs of the Initial Exploration Program"] shall be allocated to INDOMAR.

With respect to dissolution, the Indomar partnership agreement provided in part that

(c) A Partner who withdraws after the First Withdrawal Date upon giving sixty days advance notice to the Partnership shall be entitled to receive an assignment of an undivided interest in the properties of the Partnership determined on an area-by-area or well-by-well basis in accordance with its share of the income therefrom under Article VI hereof, subject to its assumption of its pro rata share of the liabilities and obligations of the Partnership.

(e) Upon the dissolution of the Partnership where the Partnership is not reconstituted as provided ... the Partnership shall be completely liquidated, a proper accounting shall be made of the accounts of the Partnership as of the date of dissolution in the same manner as Partnership accounting is made at the end of any fiscal period, and the Partnership's liabilities, obligations to creditors and expenses of liquidation shall be paid. The Partnership properties shall be distributed to the Partners in the manner contemplated by paragraph (c) of this Article XII.

During 1970, Indomar invested $8,931,-284 in Souex. Souex reported a loss of $11,777,288 on its tax return that year;

$9,004,322 was allocated to Indomar comprising $8,570,000 in drilling costs paid in 1970 and $434,322, which was 13.5417% of the remainder of the Souex loss in 1970. The Indomar partners then took deductions based on Indomar's loss, due in part to the special allocation.

Prior to this case, the IRS challenged the tax returns of at least two other Indomar partners. *See Allison v. United States,* 701 F.2d 933 (Fed.Cir.1983), *reversing,* 82–1 U.S.T.C. para. 9163 (Ct.Cl.1982); *Dillon v. United States,* 84–2 U.S.T.C. para. 9921 (S.D.Tex.1981). The Federal Circuit in *Allison* considered and decided in favor of the IRS the primary issue in the present case, the validity of the special allocation to Indomar.

The Tax Court reviewed the present case on stipulated facts, including the findings made in *Allison,* 82–1 U.S.T.C. para. 9163. The Court, noting that the taxpayers had extended the statute of limitations period, rejected their claim that the IRS should be estopped from asserting the deficiency because the IRS did not issue the 30–day letter until 1986 and did not send the notice of deficiency until 1988. Additionally, the Court concluded, citing *Allison,* 701 F.2d 933, that the special allocation of drilling costs to Indomar lacked "substantial economic effect," and that its principal purpose was the avoidance of taxes. *See* 26 U.S.C. § 704(b) (1970). The taxpayers' deduction based on the special allocation was disallowed, resulting in a deficiency. The Court found the penalty interest rate (120% of the regular rate), which was enacted in 1984, applicable to the interest accruing on this deficiency after 1984. 26 U.S.C. § 6621(c).[3] This penalty provision, which covers tax-motivated transactions, including transactions without economic substance, *i.e.* shams, 26 U.S.C. § 6621(c)(3)(A)(v), applied because according to the Court the finding that the special allocation was "without substantial economic effect" was equivalent to holding that it was "without economic substance."

The taxpayers appealed the decision of the Tax Court.

## Discussion

### I. Estoppel Against the IRS

The Tax Court properly rejected the taxpayers' argument that the IRS should be estopped from asserting the tax deficiency because the IRS waited until 1986 to send the 30–day letter and until 1988 to send the notice of deficiency, thus allegedly preventing Timothy Carberry's estate from deducting the proposed income tax liability for estate tax purposes. The doctrine of estoppel "is applied against the Government 'with the utmost caution and restraint.'" *Boulez v. Commissioner,* 76 T.C. 209, 214–15 (1981) (quoting *Estate of Emerson v. Commissioner,* 67 T.C. 612, 617 (1977)), *aff'd* 810 F.2d 209 (D.C.Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). The taxpayers have failed to demonstrate that this case is one of those "'rare instances'" where the IRS should be estopped. *Boulez,* 76 T.C. at 216 (quoting *Estate of Emerson,* 67 T.C. at 618). Here, the taxpayers properly executed several statute of limitations extension forms and at no point sought to revoke the extensions. Additionally, the taxpayers' claim of detrimental reliance is not supported where the taxpayers were aware, in the mid–1970s, of the audit and the possibility of a problem with the 1970 tax return and the 1967 carryback.

### II. Special Allocation of Partnership Deductions

The allocation of partnership deductions is governed by 26 U.S.C. § 704(b), which states:

A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

---

**3.** The subsection was redesignated from (d) to (c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub.L.No. 99–514, 100 Stat. 2744.

The provision will be cited hereafter as section 6621(c).

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

The regulation implementing this section provides:

> In determining whether the principal purpose of any provision in the partnership agreement for a special allocation is the avoidance or evasion of Federal income tax, the provision must be considered in relation to all the surrounding facts and circumstances. *Among the relevant circumstances are the following:* Whether the partnership or a partner individually has a *business purpose* for the allocation; *whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences;* whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation.

Treas.Reg. § 1.704–1(b)(2) (1964) (emphasis added). The taxpayers argue that the Tax Court erred in two ways in finding that the special allocation should not be recognized for tax purposes.

First, the taxpayers, relying on *Orrisch v. Commissioner,* 55 T.C. 395 (1970), *aff'd per curiam,* 31 AFTR 2d 1069 (9th Cir. 1973), contend that under the law in 1970, a special allocation was given effect for tax purposes so long as it had a valid business purpose. Building on this premise, the taxpayers claim that the special allocation had a valid business purpose because, in view of the risky nature of the venture, Indomar would be willing to fund the drilling only if the costs of drilling were allocated to it.

What *Orrisch* actually said, however, was that the reference in the regulations to substantial economic effect

> was apparently added ... to allay fears that special allocations of income or deductions would be denied effect in every case where the allocation resulted in a reduction in the income tax liabilities of one or more of the partners. The statement is an affirmation that special allocations are ordinarily to be recognized if they have business validity apart from their tax consequences.

*Orrisch,* 55 T.C. at 400–01. The Tax Court was not endeavoring to formulate a precise test or factor that would always make a special allocation safe but rather was seeking to make clear that the existence of a tax benefit did not mean that the allocation would not be recognized. The reference to "business validity" was not intended to be a consideration exclusive of economic effect. Therefore, even if there was a business reason for Souex's decision to allocate the costs of drilling to Indomar, the validity of the allocation for tax purposes still required examination of the economic effect of the allocation.

The taxpayers' second argument is that the Tax Court erred in relying primarily on the "substantial economic effect" test in its section 704(b) analysis. Prior to 1976, this language was only in the regulations, not in the statute, and the taxpayers contend that the change in 1976 by which this language was moved to the statute as the basic test for permissible allocations represented a major departure from prior law and should not be applied to the taxpayer's pre–1976 transaction. However, that conclusion is not supported by the case law. Prior to 1976, "substantial economic effect" was a key factor, and in its absence the remaining regulation 1.704–1(b)(2) factors could not redeem the allocation. *See Ogden v. Commissioner,* 788 F.2d 252, 261 (5th Cir.1986) ("1976 revision of section 704(b)(2) was less substantive than it may appear; even under the prior law it was stated that 'An allocation that lacks "sub-

stantial economic effect" will not be saved' " by the other factors) (citation omitted); *Allison*, 701 F.2d at 937 (1976 amendment's "change in language had minor substantive effect, at best, on the evaluation given special allocations by the courts which even before 1976 emphasized the existence of substantial economic effect over the other factors"); *Hamilton v. United States*, 687 F.2d 408, 414, 231 Ct.Cl. 517 (1982) ("An allocation that lacks 'substantial economic effect' will not be saved by meeting the other five factors in the regulation."); *Goldfine v. Commissioner*, 80 T.C. 843, 850 n. 9 (1983) (1976 amendment to section 704(b) "seem[ed] to adopt the judicial gloss that had previously been applied to the pre–1976 statutory provisions").

The question before this Court, therefore, is whether the special allocation of drilling costs to Indomar had substantial economic effect. The Commissioner argues that this allocation did not have substantial economic effect because there was no gain charge-back provision in the partnership agreement,[4] no requirement that the capital accounts be adjusted to reflect the special allocation, and no requirement that the distributions on liquidation be based on capital accounts. We agree with the Tax Court, and with the Federal Circuit in *Allison*, that this special allocation lacked substantial economic effect. Although the record indicates that Indomar's capital account was written down by the amount of the allocated loss, that step was not required by the Souex partnership agreement. More importantly, there was no requirement that the partnership distributions on liquidation reflect the capital accounts, and in fact, the assets, as specified in the Souex partnership agreement, were distributed according to the partners' initial investment percentages (*e.g.*, 13.5417% for Indomar). As a result, Indomar sought to receive the benefit of the special allocation without necessarily bearing the burden of that allocation when Souex was liquidated.

After the liquidation of Souex, Indomar apparently assigned as the basis in its undivided interest in the Souex assets its (Indomar's) capital account balance on the date of liquidation. As noted above, this account figure was reduced to reflect the special allocation. However, the fact that Indomar used this reduced amount for its basis in the assets does not satisfy the requirement that the special allocation have substantial economic effect. Whether the distribution of assets upon liquidation was based on the partners' initial investment percentages or upon their capital accounts, the basis that Indomar would have assigned to its share of the assets would have been the same.

## III. Penalty Rate of Interest

▉ The Tax Court properly approved the application of the section 6621(c) penalty interest rate to the taxes owed by the taxpayers after 1984, due to the nonrecognition of the special allocation. The increased interest rate was enacted in 1984 and was effective with respect to interest accruing after December 31, 1984. Pub. L.No. 98–369, § 144(c), 98 Stat. 494, 683 (1984). Although the tax return in question was filed for 1970, the change in effective rates can be applied to taxes owed by the taxpayers on this return after 1984. *See Solowiejczyk v. Commissioner*, 85 T.C. 552, 555 (1985) (increased interest penalty rate is not being applied retroactively because "[t]he event which subjects petitioners to the imposition of section [6621(c) ] is not the filing of their 1978 tax return, but the existence, beyond the effective date of section [6621(c) ], of an underpayment attributable to a [tax-motivated transaction]"), *aff'd*, 795 F.2d 1005 (2d Cir.1986).

Under section 6621(c), which may be applied to the taxpayers' 1970 return, a penalty interest rate of 120% of the normal rate is levied on deficiencies attributable to "tax motivated transactions." Section 6621(c)(1). Tax-motivated transactions include "sham or fraudulent transaction[s]."

---

**4.** A gain charge-back provision allocates the gain from an item to the partner who received the special allocation of deductions from that item until the deductions previously allocated to that partner have been recouped.

Section 6621(c)(3)(A)(v). The Tax Court correctly concluded that its finding under section 704(b) that the special allocation lacked "substantial economic effect" was equivalent to saying the allocation was without "economic substance," the definition of a sham. *See Ferrell v. Commissioner*, 90 T.C. 1154, 1206 (1988).

 A court determines whether a transaction has substantial economic effect for purposes of section 704(b) by considering whether "the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences." Treas. Reg. 1.704–1(b)(2). A court examining whether a transaction is a sham looks to "whether the transaction had any practical economic effects other than the creation of income tax losses," *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *see Rose v. Commissioner*, 868 F.2d 851, 854 (6th Cir.1989). The equivalency of these two standards has previously been recognized, *see Holladay v. Commissioner*, 649 F.2d 1176, 1180 (5th Cir.1981) ("allocation of all of the venture's losses to Holladay lacked economic substance and was clearly a sham under IRC § 704(a)"), and supports the Tax Court's determination that Indomar's special allocation, which failed section 704(b)(2) for lack of substantial economic effect, was also a sham under section 6621.

### Conclusion

For the foregoing reasons, the decision of the Tax Court is affirmed.