Robert SOLOMON, Jane B. Solomon, and First Keystone Consultants, Inc., Plaintiffs,

v.

SIEMENS INDUSTRY, INC., Schlesinger–Siemens LLC, Siemens AG, Frank Krutemeier, and Manatt, Phelps & Phillips, LLP, Defendants.

No. 11–CV–1321 (DLI)(SMG).

United States District Court, E.D. New York.

Signed March 26, 2014.

Robert Solomon, Port St. Lucie, FL, pro se.

Jane Solomon, Port St. Lucie, FL, pro se.

Neil Barry Solomon, McLaughlin & Stern, West Palm Beach, FL, Richard H. Agins, Sigman & Zimolong, LLC, Philadelphia, PA, for Plaintiffs.

Kimo Silvay Peluso, Manatt, Phelps & Phillips, LLP, New York, NY, for Defendants.

### *SUMMARY ORDER ADOPTING REPORT AND RECOM-MENDATION*

DORA L. IRIZARRY, District Judge.

Plaintiffs filed this action against defendants asserting various claims arising from a failed business venture involving plaintiffs, defendants, and other non-parties. Defendants Manatt, Phelps & Phillips, LLP ("Manatt") and Seimans Industry, Inc. ("SII") moved for summary judgment (*see* Manatt Motion for Summary Judgment, Dkt. Entry No. 119; SII Motion for Summary Judgment, Dkt. Entry No. 118), which plaintiffs opposed (*see* Plaintiffs' Opposition, Dkt. Entry Nos. 143, 144). On July 11, 2012, the Court referred these motions to the Honorable Steven M. Gold, Chief United States Magistrate Judge for the Eastern District of New York, to prepare a Report and Recommendation. On June 21, 2013, Chief Magistrate Judge Gold issued his Report and Recommenda-

tion ("R & R"), recommending that the Court grant the motions for summary judgment in favor of defendants Manatt and SII and recommending dismissal of the action. (*See* R & R, Dkt. Entry No. 193.) Additionally, the magistrate judge denied Plaintiffs' motion to unseal certain documents filed in connection with these motions. (*See* R & R at 285–87.) Plaintiffs filed objections to the R & R (*see* Plaintiff's Objections ("Pls.' Obj."), Dkt. Entry No. 197), which defendants Manatt and SII jointly opposed (*see* Manatt & SII Opposition to Pls.' Obj. ("Defs.' Opp'n to Obj."), Dkt. Entry No. 216).

## STANDARD OF REVIEW

When a party objects to a R & R, a district judge must make a *de novo* determination with respect to those portions of the R & R to which the party objects. *See* FED. R. CIV. P. 72(b); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). If, however, a party makes conclusory or general objections, or attempts to relitigate the party's original arguments, the court will review the R & R for clear error. *Robinson v. Superintendent, Green Haven Correctional Facility*, 2012 WL 123263, at *1 (E.D.N.Y. Jan. 17, 2012) (quoting *Walker v. Vaughan*, 216 F.Supp.2d 290, 292 (S.D.N.Y.2002)). The district court may then "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

## DISCUSSION

As a preliminary matter, plaintiffs do not object to the portions of the R & R that recommend dismissal of the: (1) second, third, and fifth causes of action as time-barred (*see* R & R at 273–75); (2) eighth through eleventh causes of action,

premised on Manatt's aiding and abetting SII (*see* R & R at 283–84); (3) twelfth and fourteenth causes of action seeking punitive damages and alleging a conspiracy among the defendants (*see* R & R at 283–84); and (4) thirteenth cause of action for intentional infliction of emotional distress (*see* R & R at 284–85). The Court has reviewed the submissions in connection with this motion and hereby adopts the unopposed recommendations of the R & R as to these claims. Accordingly, the second, third, fifth, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth causes of action are dismissed.

Plaintiffs object to the magistrate judge's recommendation that the first, fourth, sixth, and seventh causes of action which assert tax loss claims, be dismissed. (*See* R & R at 274–83; Pls.' Obj. at 3–28.) It is apparent that plaintiffs seek to relitigate many of the issues already briefed in their opposition to summary judgment. Nonetheless, the Court has carefully considered each of plaintiffs' objections. Upon review of the characteristically thorough, thoughtful, and wellreasoned R & R of Chief Magistrate Judge Gold, the Court hereby adopts the R & R in its entirety. Accordingly, the Court dismisses the first, fourth, sixth, and seventh causes of action.

Plaintiffs also challenge the magistrate judge's denial of their motion to unseal the documents exchanged during discovery and relied upon by the parties in connection with the briefing for the motion for summary judgment. (*See* Pls.' Obj. at 29–33.) As a preliminary matter, the objections to Magistrate Judge Gold's final order were untimely as they were not properly filed or served on defendants within the deadlines for such objections. *See* Fed.R.Civ.P. 72(a) ("A party may not assign as error a defect in the order not timely objected to."). Moreover, the ob-

jections lack merit. Again, the Court incorporates by reference Chief Magistrate Judge Gold's thoughtful discussion of the issues underlying the final order denying plaintiffs' motion, which this Court incorporates in full. Accordingly, plaintiffs' request to unseal the documents is denied.

## CONCLUSION

Upon due consideration, the R & R is adopted in its entirety. The complaint is dismissed as to all defendants. Furthermore, Magistrate Judge Gold's order denying plaintiffs' motion to unseal will remain in force notwithstanding the dismissal of this action.

SO ORDERED.

*Report & Recommendation on Summary Judgment Motions and Order on Motion to Unseal*

GOLD, STEVEN M., United States Magistrate Judge.

## INTRODUCTION

This litigation is one of several arising from the failure of the business relationship between plaintiffs and non-party Schlesinger Electrical Contractors, Inc. ("Schlesinger or SEC"). In this action, plaintiffs assert several claims against defendant Siemens Industry, Inc. ("SII" or "Siemens") arising out of Siemens' dealings with Schlesinger, and against Manatt, Phelps & Phillips, LLP ("Manatt"), a law firm that advised Siemens in connection with those dealings. Having completed

discovery, the parties now bring cross-motions for summary judgment. Docket Entries 118, 119 and 143.[1] The Honorable Dora L. Irizarry has referred the motions to me for report and recommendation. Following Judge Irizarry's referral, plaintiffs filed a motion seeking public disclosure of documents that defendants, with prior permission from the Court, filed under seal. Docket Entry 180. For the reasons stated below, I respectfully recommend that the Siemens and Manatt summary judgment motions be granted. in their entirety and that plaintiffs' cross-motion for summary judgment be denied. I also deny plaintiffs' motion to unseal and order that the documents filed under seal in this case remain so.

## FACTS

### a. *Introduction*

This case arises out of the overlapping relationships of plaintiffs and defendants with Schlesinger Electrical Contractors, Inc. More specifically, plaintiffs contend primarily that Siemens, by negotiating a revision to the terms of its relationship with Schlesinger, appropriated tax losses that should have flowed to FKC as a result of *its* relationship with Schlesinger.

The facts set forth below are drawn in large part from defendants' and plaintiffs' Local Civil Rule 56.1 Statements ("Defs. R. 56.1," Docket Entry 189 and "Pls. Resp. R. 56.1," Docket Entry 177, respectively). Plaintiffs also submitted a supplemental statement of undisputed facts ("Pls. Supp.

---

1. While Manatt and Siemens have filed separate summary judgment motions and memoranda of law regarding those motions, they have submitted joint Local Civil Rule 56.1 statements and joint supporting exhibits.

 Many of the documents in this case have been filed both under seal in their entirety and publicly with redactions. The docket entry numbers cited in this Report are those of

the redacted versions. In addition, defendants resubmitted their Rule 56.1 statement and certain supporting affidavits with previously redacted material disclosed on December 28, 2012, pursuant to an Order issued December 19, 2012. Docket Entries 188–190. This Order and the redaction of documents in this case will be further discussed below in connection with plaintiffs'. motion to unseal.

R. 56.1," Docket Entry 157), to which defendants responded ("Defs. Resp. Supp. R. 56.1," Docket Entry 169); these additional submissions bear less directly on the pending motions and thus will be cited less frequently.

Because the parties refer to the various entities relevant to the pending motions by acronyms that can be difficult to recall and recognize, I set them out here, in one place, for the reader's convenience:

**FKC**—First Keystone Consultants, a plaintiff in this action whose officers are *pro se* plaintiffs Robert and Jane Solomon, and a joint venture partner with Schlesinger Electrical Contractors in SFD Associates;

**SII**—Siemens Industry, Inc., a defendant in this action, and a member, with Schlesinger Electrical Contractors, in Schlesinger–Siemens Electrical, LLC;

**SEC**—Schlesinger Electrical Contractors, Inc., a non-party, and both a joint venture partner with plaintiff FKC in SFD associates and a member, with defendant Siemens, in Schlesinger–Siemens Electrical, LLC;

**SSE**—Schlesinger–Siemens Electrical, LLC, a non-party, the members of which are Siemens and Schlesinger, sometimes referred to in this Report as the LLC; and

**SFD**—SFD Associates, a joint venture that included SEC and FKC.

### b. *Formation of the SSE and SFD Entities*

In 2004, Schlesinger Electrical Contractors, Inc. ("Schlesinger" or "SEC"), a non-party, and defendant Siemens formed Schlesinger–Siemens, LLC ("SSE" or "the LLC"). Defs. R. 56.1 ¶ 6; Pls. Resp. R. 56.1 ¶ 6.[2] The original SSE Operating Agreement identifies the purpose of the LLC as "bidding upon, and, if the successful bidder, negotiating, executing, and performing" a particular contract for electrical work on behalf of the New York City Department of Environmental Protection ("NYC–DEP"). 2004 Operating Agreement ¶ 1.3, Peluso Ex. 6, Docket Entries 133–10 to 133–12.[3] Mr. Solomon avers that he was integral to negotiating the company's formation. *See* Pls. Resp. R. 56.1 ¶ 6; R. Solomon Decl. ¶¶ 12–18 (discussing Solomon's role during these negotiations and, in paragraph 12, his understanding that FKC "would invest money to have an ownership stake in every NYC–DEP contract that [the LLC] may be awarded").[4]

The following year, SSE's business was expanded to include bidding on other projects for the NYC–DEP. *See* 2005 Operating Agreement ("Operating Agreement" or "OA") ¶ 1.3, Peluso Ex. 7, Docket Entry 133–13. Most of the terms governing SSE's operations were set out in the 2005 agreement, which was then revised in 2007, 2008, and finally, in ways critical to the dispute in this case, in 2010. *See generally* OA; Pls. Ex. 22, Docket Entry

---

**2.** Defendants and plaintiffs disagree as to whether the full name of the LLC was originally "Schlesinger–Siemens Electrical, LLC," *see* Defs. R. 56.1 ¶ 6, or "Schlesinger–Siemens, LLC," *see* Pls. Resp. R. 56.1 ¶ 6. In any event, it is clear that the company eventually changed its name to "Schlesinger–Siemens Electrical, LLC." *See, e.g.*, Docket Entry 135–7 (2010 agreement between Siemens and Schlesinger Electrical Contractors in which the parties to the contract note, in the agree-

ment's preamble, that SSE "changed its name to Schlesinger–Siemens Electrical, LLC" sometime after formation).

**3.** "Peluso Ex." refers to the exhibits attached to the declaration of Kimo S. Peluso, counsel for defendants, Docket Entry 133.

**4.** "R. Solomon Decl." refers to the declaration of Robert Solomon, Docket Entry 155.

150–21 (minutes of the SSE Board of Managers December 14, 2007, during which the Operating Agreement was revised);[5] Peluso Ex. 18, Docket Entry 134–6 (minutes of the SSE Board of Managers April 28, 2008 meeting, during which the Operating Agreement was again revised); Restructuring and Release Agreement ("Restructuring Agreement" or "RA"), Peluso Ex. 42, Docket Entries 135–7 to 135–8 (2010 agreement revising the Operating Agreement). Plaintiffs acknowledge that they were not parties to any version of the Operating Agreement. Pls. Resp. R. 56.1 ¶ 16.

The 2005 Operating Agreement provided that the members of the LLC were SE & A (later Siemens) and Schlesinger. OA §§ 2.1–2.2. Siemens held a 51% and Schlesinger a 49% ownership interest in the LLC, but any "income, gain, revenue, or profit" realized by SSE was to be split equally between the two entities. Defs. R. 56.1 ¶ 12; Pls. Resp. R. 56.1 ¶ 12; see also OA §§ 3.2, 8.3(a)(iv); Volande Decl. ¶ 5.[6]

Schlesinger and the newly formed LLC also entered into a Support Services Agreement dated January 30, 2006. Defs. R. 56.1 ¶ 21; Pls. Resp. R. 56.1 ¶ 21; see also Support Services Agreement ("SSA"), Peluso Ex. 8, Docket Entry 133–14. The agreement provides that Schlesinger will supply certain services to the LLC, as set forth in an exhibit to the agreement, "in order to facilitate the operation" of the LLC's business. SSA § 2.1. One of the services listed in the Exhibit is business consulting, with an attendant estimated $156,000 per year cost, "[representing] a not to exceed consulting fee to be paid to First Keystone Consultants, Inc. for services in connection with management of SSE." SSA, Ex. A. § I. Plaintiff Robert Solomon asserts that, although he was not a party to the Support Services Agreement, this section of the agreement demonstrates that he was "responsible for the overall day-to-day management of the LLC" and that the money he was paid in this role indicates that "SEC was required to pass through to FKC what SEC received from SII pursuant to the SSA." R. Solomon Decl. ¶ 33. In essence, then, Mr. Solomon contends that FKC was entitled, pursuant to the Support Services Agreement, to a share of the amounts Schlesinger earned by virtue of being a member of the LLC.

After the formation of SSE, FKC and Schlesinger created a joint venture, SFD Associates.[7] See Defs. R. 56.1 ¶ 28; Pls. Resp. R. 56.1 ¶ 28. The roles of each entity in the joint venture were set out in two agreements that the parties agree are identical for the purposes of the pending motions. See Defs. R. 56.1 ¶ 29; Pls. Resp. R. 56.1 ¶ 29.[8] The SFD Agreement specifies that each of the Joint Venturers is to be awarded one-half of the profits after the completion of a project. SFD

---

5. "Pls. Ex." refers to the exhibits plaintiffs offer in opposition to the instant motion. These exhibits are attached to plaintiffs' memorandum of law, Docket Entry 150.

6. "Volande Decl." refers to the declaration of Harry G. Volande, Chief Financial Officer of SE & A and later Siemens, as well Chairman of SSE's Board of Managers from 2005 to the fall of 2009, Docket Entry 136.

7. An earlier joint venture existed under the same name and included the same compa-nies, as well as well as a third entity called DDR Construction Services. Defs. R. 56.1 ¶ 30, Pls. Resp. R. 56.1 ¶ 30; see also Peluso Ex. 5, Docket Entry 133–9 (copy of the 2004 SFD Agreement).

8. Defendants misidentify this agreement as Exhibits 10 and 11 to Mr. Peluso's submission. The agreements are in fact Peluso Exhibits 9 and 10, Docket Entries 133–15 to 133–16, as well as plaintiffs' Exhibits 5 and 6, Docket Entries 150–6 to 150–7.

Agreement ¶ 20. The parties agree that SSE and Siemens were not parties to this contract, *see* Defs. R. 56.1 ¶ 31; Pls. Resp. R. 56.1 ¶ 31; however, plaintiffs contend that Siemens "adopted, approved and agreed to" at least parts of the agreement by citing it when voiding a later contract it had made to purchase FKC's share of SFD. Pls. Resp. R. 56.1 ¶ 32.

### c. *Removal of Solomon From the Board*

Pursuant to SSE's Operating Agreement, its Board of Managers was comprised of three representatives appointed by Siemens and two by Schlesinger. Defs. R. 56.1 ¶ 15; OA ¶ 7.2(b). Once the agreement was executed, Schlesinger appointed Robert Solomon to the Board. Defs. R. 56.1 ¶ 18; Pls. Resp. R. 56.1 ¶ 18. According to Mr. Solomon, an initial investment he made in SFD, that was then contributed to SSE, was conditioned upon this appointment. Pls. Resp. R. 56.1 ¶ 18; R. Solomon Decl. ¶ 21.

In 2007, the relationship between Robert Solomon and Schlesinger began to break down, with the result that Mr. Solomon was removed from the board of Schlesinger–Siemens Electrical, LLC. In addition to citing complaints lodged by Schlesinger against Solomon, Defs. R. 56.1 ¶ 36; Pls. Resp. R. 56.1 ¶ 36, defendants argue that a 2007 audit of the LLC revealed deficiencies in its business practices that were attributable to Solomon, Defs. R. 56.1 ¶¶ 39–40; *see also* Peluso Ex. 11, Docket Entry 133–17 (copy of the audit report). In December of 2007, the SSE Board voted to restructure the company's management by appointing three company officers—two general managers (one appointed by Siemens and one by Schlesinger) and a controller—with Solomon alone in opposition to the proposal. Defs. R. 56.1 ¶ 43; Pls. Resp. R. 56.1 ¶ 43; *see also* Dec. 14, 2007 Board Minutes, Peluso Ex. 13, Docket Entry 133–19. The appointed officers did not include Solomon, and he contends that this change was designed "to vote [him] out . . . as SSE's Co–General Manager." Pls. Resp. R. 56.1 ¶ 42.

In March of 2008, Siemens conducted another audit of SSE focused on its practices during 2007. *See* Defs. R. 56.1 ¶ 80; Pls. Resp. R. 56.1 ¶ 80; *see also* Peluso Ex. 19, Docket Entry 134–7 (Siemens' final audit report, dated June 23, 2008). Siemens states that the report "criticized Robert Solomon's handling of material purchases, hiring and financial controls." Defs. R. 56.1 ¶ 82. Plaintiffs question the accuracy of many elements of the report, *see, e.g.,* Pls. Resp. R. 56.1 ¶¶ 86–87, and label it defamatory, but also acknowledge that the report was "the only defamatory statement Defendants made against Mr. Solomon of which he is aware," Pls. Resp. R. 56.1 ¶ 81.

### d. *SSE's Tax Losses*

The parties agree that SSE sustained losses in the tax years ending in September 2008, 2009 and 2010. Defs. R. 56.1 ¶¶ 49–51, 53; Pls. Resp. R. 56.1 ¶¶ 49–51, 53; *see also* Baskinger Decl. ¶¶ 24, 26, 28.[9] It is the allocation of these losses, or the right to claim them for tax purposes, that forms the primary basis of plaintiffs' lawsuit.

Schlesinger–Siemens Electrical, LLC was initially financed by a $5100 contribu-

---

**9.** "Baskinger Decl." refers to the declaration of Janet Baskinger, Director of Tax for Siemens Corporation, an entity affiliated with defendant Siemens Industry, Inc. The Baskinger declaration was originally filed as Docket Entry 137. Defendants refiled Ms. Baskinger's declaration with more limited redactions on December 28, 2012, Docket Entry 190, pursuant to my Order of December 19, 2012.

tion from Siemens and a $4900 contribution from Schlesinger. *See* Defs. R. 56.1 ¶ 12, Pls. Resp. R. 56.1 ¶ 12 (denoting the percentage ownership of each entity); Baskinger Decl. ¶ 14 (discussing the monetary contributions). In 2006, each entity contributed $300,000 to the company. Defs. R. 56.1 ¶ 51; *see also* Baskinger Decl. ¶ 14.[10]

SSE's 2005 and 2006 tax returns reflect that the LLC made a profit. Defs. R. 56.1 ¶ 47; Pls. Resp. R. 56.1 ¶ 47.[11,12] The LLC began losing money in the 2007 tax year, however, Defs. R. 56.1 ¶¶ 49–51; Pls. Resp. R. 56.1 ¶¶ 50–51, because, according to Siemens, "actual job costs exceeded estimates [made] at the time of bidding," Defs. R. 56.1 ¶ 49; *see also* Volande Decl. ¶¶ 15–18 (describing company's losses as beginning to accrue between 2007 and 2008). By some point during 2008, the LLC's losses exceeded its profits and the capital contributions of Siemens and Schlesinger were depleted. Defs. R. 56.1 ¶ 51; Pls. Resp. R. 56.1 ¶ 51; *see also* Volande Decl. ¶ 18; Baskinger Decl. ¶¶ 24, 25. SSE's tax returns for 2008 and 2009 continue to show losses. Defs. R. 56.1

¶ 53; Pls. Resp. R. 56.1 ¶ 53; *see also* Baskinger Decl. ¶¶ 26, 28. While Siemens does not point to a precise time when the practice began, it does state that, by 2008, it was paying for Schlesinger's share of the LLC's losses with loans from a Siemens affiliate. *See* Defs. R. 56.1 ¶ 52; Volande Decl. ¶¶ 18, 20, 21; *see also* Baskinger Decl. ¶ 23 (indicating that Siemens "alone began injecting additional funds into the business to cover [the] deficits" beginning in the 2007–2008 tax year). Plaintiffs do not appear to take a position on whether these loans from a Siemens affiliate were made, other than by asserting that they have not seen the loan documents, but they do dispute Siemens' assertion that Schlesinger was not obligated to repay those loans, and point to entries in the LLC's original tax returns that appear to attribute half of the company's losses to Schlesinger. *See* Pls. Resp. R. 56.1 ¶¶ 52, 54.

e. *The Purchase, Settlement and Restructuring Agreements*

In July of 2009, Siemens and FKC signed an agreement pursuant to which

---

**10.** Plaintiffs acknowledge that these contributions were made; however, they aver that FKC provided half of Schlesinger's contribution, or $150,000. Pls. Resp. R. 56.1 ¶ 51; *see also* R. Solomon Decl. ¶ 24. As evidence of this transaction, plaintiffs have submitted a check from First Keystone to Schlesinger apparently cashed in November of 2005, as well as correspondence with a Siemens affiliate about the contributions generally made to SEC, though not specifically about $150,000 paid into the company by FKC or the Solomons. Pls. Ex. 16, Docket Entry 150–17.

**11.** SSE's tax returns have been filed under seal, and are thus accessible only to the parties and the Court. *See* Baskinger Decl. Exs. 3 (amended 2007 tax return), 4 (amended 2008 return); Pls. Exs. 24 (original 2007 return), 25–26 (original 2008 return). While as discussed below I direct that the returns remain under seal, in part because I have not relied on any specific entries in them in re-

porting on the pending motions, I have reviewed the returns to ensure that they support the contentions made by the parties and experts.

As further discussed below, SSE's 2007 and 2008 tax returns were amended in 2011, and plaintiffs dispute the propriety of these amendments. *See* Pls. Supp. R. 56.1 ¶¶ 76–78; Defs. Resp. Supp. R. 56.1 ¶¶ 76–78; *see also* Baskinger Decl. ¶¶ 34, 39–40. The amendments do not relate to the amount of the company's overall losses.

**12.** Although the projects on which SSE had bid were not completed as this time, these profits apparently reflect a calculation based on the percent-of-completion method (PCM). Defs. R. 56.1 ¶ 48; Pls. Resp. R. 56.1 ¶ 48. PCM is "[a]n accounting method in which revenue is recognized gradually during the completion of the subject matter of the contract." *Black's Law Dictionary* (9th ed.2009).

Siemens would purchase FKC's 50% share of SFD. Defs. R. 56.1 ¶¶ 64–65; Pls. Resp. R. 56.1 ¶¶ 64–65; *see also* Peluso Ex. 26, Docket Entry 134–14 (copy of the agreement). Approximately one month after the purchase, however, Siemens declared the contract "void *ab initio*" and contends it did so at least in part because "FKC did not obtain approval from Schlesinger for the sale of FKC's interest," apparently in contravention of the SFD Agreement. Defs. R. 56.1 ¶ 68; Peluso Ex. 29, Docket Entry 134–17 (copy of the letter from Siemens stating that it considered the agreement void); SFD Agreement ¶ 24 (stating that "no party may assign, transfer, pledge or hypothecate its interest, or any party [sic] thereof, under this Joint Venture . . . or its interest in any property of monies of this Joint Venture except with the prior written consent of all the other parties"). Plaintiffs maintain that representatives of Siemens counseled Mr. Solomon not to seek Schlesinger's consent because of his poor relationship with its principal, and that Siemens' later reference to the SFD Agreement when voiding the purchase agreement and its "eager[ness] to purchase FKC's ownership interest in SFD" is tantamount to an admission that FKC held some valuable interest in SSE. Pls. Resp. R. 56.1 ¶ 68; *see also* Pls. Supp. R. 56.1 ¶¶ 1–29; Defs. Resp. Supp. R. 56.1 ¶¶ 1–29 (detailing the parties' disagreements regarding both whether Schlesinger's consent was needed and when this issue was raised with Siemens); Pls. Exs. 36–38, Docket Entries 150–26 to 150–28 (memoranda from Schlesinger to Siemens asserting that Siemens' potential purchase of FKC's interest in SFD interest was contrary to the SFD Agreement). Plaintiffs further allege that Manatt knew that the SFD Agreement required Schlesinger's consent before the Purchase Agreement could be was executed. Pls. Supp. R. 56.1 ¶¶ 21, 25, 28–29.

Following the dispute over Siemens' failure to complete its agreement to purchase FKC's interest in SFD, Siemens and FKC executed a General Release and Settlement Agreement. Peluso Ex. 34, Docket Entry 134–22; *see also* Defs. R. 56.1 ¶ 70; Pls. Resp. R. 56.1 ¶ 70. This agreement provides that, in consideration for Siemens' payment of $750,000 to FKC, plaintiffs "fully and forever unconditionally release, remise, discharge and acquit [Siemens and its related entities] from any and all claims [arising] . . . from the beginning of time through the Execution Date of this Settlement Agreement." Settlement Agreement ¶¶ 1, 3. Siemens similarly released any claims it had against the Solomons and FKC. Pls. Resp. R. 56.1 ¶ 73; Settlement Agreement ¶ 2.

The following month, though, FKC commenced a lawsuit (the "Bronx Action") against SSE and other parties seeking to recover for breach of contract and to foreclose on certain liens. Defs. R. 56.1 ¶ 109; Pls. Resp. R. 56.1 ¶ 109; *see also* Peluso Ex. 38, Docket Entry 135–3 (Complaint, *First Keystone Consultants v. N.Y.C. Dep't Envtl. Prot. et al.,* No. 303366/2010, 2010 WL 1812840 (N.Y.Sup.Ct. Bronx Cnty. filed Apr. 26, 2010)). After learning of the suit, Siemens declined to make the final payment due to FKC under the Settlement Agreement, asserting that the filing of the Bronx Action breached that agreement. Defs. R. 56.1 ¶ 113; Pls. Resp. R. 56.1 ¶ 113; *see also* Friedman Decl. ¶ 29 (describing the decision to "suspend[ ] payment of the final $175,000 otherwise due under the Settlement Agreement" as "[b]ased on the filing of the Bronx Action, a clear breach of the Settlement Agreement").[13] This amount appar-

---

**13.** "Friedman Decl." refers to the declaration of Kenneth D. Friedman, an attorney with

ently remains unpaid.[14]

Approximately a year later, on September 21, 2010, Schlesinger and Siemens entered into an agreement restructuring the responsibilities of each party under the SSE Operating Agreement. Defs. R. 56.1 ¶ 114; Pls. Resp. R. 56.1 ¶ 114; *see also* Restructuring Agreement, Peluso Ex. 42, Docket Entry 135–7. As will be discussed below, this Restructuring Agreement purported to reallocate responsibility for the losses of the LLC, and is thus at the heart of plaintiffs' claims. Plaintiffs, citing a number of emails from Manatt attorneys, allege that Manatt drafted the Restructuring Agreement and advised Siemens to sign it. Pls. Supp. R. 56.1 ¶ 31. Siemens declines to respond to this statement of fact on the basis of attorney-client privilege. Defs. Resp. Supp. R. 56.1 ¶ 31. I assume the allegation to be true for purposes of this Report.

Among other things, the Restructuring Agreement removed the responsibility Schlesinger had under the Operating Agreement for cost overruns and losses and provided that it would not be subject to calls for capital contributions or to fund LLC expenses. Restructuring Agreement ¶ 1.01(a). At the same time, the Restructuring Agreement reallocated the right to claim all tax losses from October 1, 2009 forward to Siemens, but did not alter the allocation of profits outlined in the Operating Agreement. *Id.* ¶ 1.01(c). Finally, the Restructuring Agreement terminated the Support Services Agreement (SSA) between Schlesinger and the LLC. *Id.* ¶ 1.03.

Siemens maintains that the provision of the Restructuring Agreement that reallocates all tax losses to it merely recognizes "Siemens' absorption of the SSE losses." Defs. R. 56.1 ¶ 116.

### f. Filing of Amended Tax Returns

In July 2011, SSE amended its tax returns for the years ending September 30, 2008 and 2009 to reallocate certain losses from SEC to Siemens. Defs. R. 56.1 ¶ 117; Pls. Resp. R. 56.1 ¶ 117; *see also* Baskinger Decl. ¶¶ 39–40, 44. According to Siemens Corporation's Tax Director, Ms. Baskinger, she and other tax professionals at Siemens Corporation consulted with Deanna Harris of the accounting firm KPMG before the returns were amended. Baskinger Decl. ¶ 34; *see also* Harris Decl. ¶¶ 5–6, 15–18 (detailing the information she was given about the SSE members' respective contributions and capital accounts and her advice to amend the tax returns and partnership agreement).[15] Plaintiffs assert that the facts provided to Ms. Harris as the basis for her advice were misleading, Pls. Supp. R. 56.1 ¶ 61, and that Ms. Harris did not review the Operating Agreement, *id.*

The amendments to the LLC's returns appear to be consistent with the advice Baskinger and Harris describe having rendered. The amended returns did not alter the total amount of losses claimed by SSE, but rather revised the allocation of the claimed losses between Siemens and Schlesinger. Defs. R. 56.1 ¶¶ 117–18; Pls. Resp. R. 56.1 ¶¶ 117–18; *see also* Basking-

---

defendant Manatt and representative of Siemens and SSE in other matters, including the Bronx Action, Docket Entry 121.

**14.** Plaintiffs assert that Siemens paid Schlesinger half of the $175,000 in settlement funds still owed to FKC when the Bronx Action was filed. Pls. Resp. R. 56.1 ¶ 113; R. Solomon Decl. ¶ 124.

**15.** "Harris Decl." refers to the declaration of Deanna Walton Harris, Managing Director of KPMG LLP, Docket Entry 191. Defendants submitted this less heavily redacted version of the declaration to replace an earlier one pursuant to my Order of December 19, 2012, Docket Entry 188.

er Decl. ¶¶ 39–40, 44. In broad terms, the effect of these amendments was to allocate all losses to Siemens in the tax returns for the years ending September 30, 2009 (i.e., the 2008 tax year) and later. Baskinger Decl. ¶¶ 39–40. The amendments were warranted, according to Siemens, because "Schlesinger's capital account was fully depleted as a result of SSE's losses in the tax year ending September 30, 2008 and has stayed at zero, as Schlesinger has not made any further capital contributions to SSE." Defs. R. 56.1 ¶ 57.[16]

Siemens maintains that these amendments were warranted not simply based upon the reallocation of responsibility for the LLC's losses set forth in the Restructuring Agreement, but also and more fundamentally because Siemens, regardless of the Restructuring Agreement, in actual fact bore the losses incurred by the LLC and was therefore entitled to claim those losses pursuant to the applicable tax laws and regulations. Defs. R. 56.1 ¶¶ 117, 119. Plaintiffs protest this contention and stress that the tax returns were revised only after the execution of the Restructuring Agreement. Plaintiffs also point to an email in which Ms. Baskinger apparently stated that the original LLC agreement was revised "to allow" for the reallocation of the tax losses. Pls. Resp. R. 56.1 ¶¶ 117, 119.

In February of 2011, the Solomons filed the instant suit.

## DISCUSSION

### a. *Time–Barred Claims*

Defendants argue that a number of plaintiffs' claims are time-barred, and plaintiffs acknowledge as much. More specifically, both sides agree that plaintiffs' claims for tortious interference with contract and aiding and abetting a breach of fiduciary duty, based on the ouster of Robert Solomon from the SSE board, are time-barred. Plaintiffs' claim for defamation was likewise brought after the statute of limitations had expired. Accordingly, as discussed below, I recommend that summary judgment be granted to the defendants on these claims.

Plaintiffs' second and third causes of action are based upon a vote to remove Robert Solomon from the LLC's Board of Managers and assert claims for tortious interference with contract and aiding and abetting a breach of fiduciary duty. *See* Am. Compl. ¶¶ 16–18, 65, 66.[17] The vote to remove Solomon took place on December 14, 2007. *See* Pls. Resp. R. 56.1 ¶ 46 (ac-

---

16. A capital account is "[a]n account on a partnership's balance sheet representing a partner's share of the partnership capital." *Black's Law Dictionary* (9th ed.2009).

17. "Am. Compl." refers to plaintiffs' Amended Complaint, Docket Entry 45. The identical amended complaint was also filed as Docket Entry 28 prior to the formal appearance of counsel on behalf of FKC. This complaint adds "Siemens AG" as a party and omits allegations against SE & A, Siemens' predecessor. According to the complaint, Siemens AG "absorbed" Siemens USA, an entity that owned Siemens Industries, Inc. Am. Compl. ¶ 1, Docket Entry 45. Plaintiffs make no allegations particular to Siemens AG.

The Amended Complaint also includes allegations against Frank Krutemeier, a citizen of Germany, who has not appeared in this case. When plaintiffs sought to remand the case to state court in 2011, Krutemeier filed a declaration stating that he had not been personally served and that he resided in Georgia from 2004 to 2010 and thereafter in Germany. *See* Krutemeier Decl. in Opposition to Motion for Remand, Docket Entry 10. FKC's counsel has certified that he served the amended complaint, discussed further in the text below, on Krutemeier in 2011, but that he did so by sending it to a Siemens address in Georgia. Docket Entry 45–1. In any event, plaintiffs have not sought entry of Krutemeier's default.

knowledging that the December 2007 vote is the underlying factual predicate for these claims). This action was commenced in February 2011.

As defendants correctly point out, tortious interference and breach of fiduciary duty claims are subject to a three-year statute of limitations, and plaintiffs' claims are thus time-barred. *See* Defs. Mem. 17, Docket Entry 132. It is well-settled that New York's three-year statute of limitations for claims of injury to property, N.Y. C.P.L.R. 214(4), applies to tortious interference with contract and breach of fiduciary duty claims. *See, e.g., Chevron Corp. v. Donziger*, 871 F.Supp.2d 229, 257 (S.D.N.Y.2012) ("The statute of limitations for tortious interference claims is three years, and it 'begins to run when the defendant performs ... the alleged interference'" (quoting *Thome v. Alexander & Louisa Calder Found.*, 70 A.D.3d 88, 890 N.Y.S.2d 16, 30 (1st Dep't 2009))); *Kaufman v. Cohen*, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157 (1st Dep't 2003) ("[W]here suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging 'injury to property,' to which a three-year statute of limitations applies" (internal citations omitted)); *St. John's Univ., N.Y. v. Bolton*, 757 F.Supp.2d 144, 172 (E.D.N.Y. 2010) ("[A] claim that the defendant aided and abetted another's breach of fiduciary duties is subject to the same limitations period applicable to the underlying breach of fiduciary duty" (internal citation omitted)).[18] Plaintiffs' motion papers do not respond to defendants' limitations contentions or present any contrary legal arguments regarding their ouster claims. *See* Docket Entry 150.

Similarly, defendants correctly posit, and plaintiffs do not dispute, that plaintiffs' defamation claim is time-barred. Plaintiffs' defamation claim, their fifth cause of action, is based on allegations that Krutemeier, a Siemens executive, published "statements ... accusing Solomon of being a criminal and made other false defamatory statements" in a 2008 audit report and that Siemens "instructed Krutemeier to obtain and publish these false statements." Am. Compl. ¶ 68. It is undisputed that the sole publication of the audit report occurred in November 2009. *See* Pls. Resp. R. 56.1 ¶¶ 103–05. The statute of limitations for defamation claims in New York is one year and begins to run upon publication. *Lehman v. Discovery Commc'ns, Inc.*, 332 F.Supp.2d 534, 537 (E.D.N.Y.2004). Plaintiffs do not contest that more than one year elapsed after the publication of the allegedly defamatory statement and before the filing of this case.[19] *See* Pls. Resp. R. 56.1 ¶¶ 103–05. Therefore, the defamation claim is time-barred.

For these reasons, I respectfully recommend that defendants be granted sum-

---

18. Breach of fiduciary duty claims in New York alleging fraud or demanding non-monetary damages are subject to a six-year statute of limitations. *Weisshaus v. New York*, 2009 WL 2579215, at *5 (S.D.N.Y. Aug. 20, 2009); *see also Kaufman*, 307 A.D.2d at 118, 760 N.Y.S.2d 157 (noting that the "applicable statute of limitations ... [generally] depends upon the substantive remedy sought"). Plaintiffs do not allege fraud and appear to seek monetary damages only. *See generally* Am. Compl. Therefore, the three-year statute of limitations applies.

19. Defendants qualify their statement that the first publication of these statements occurred in November 2009 by stating that they "are not aware of other publications after November 2009." Pls. Resp. R. 56.1 ¶ 81. Any subsequent publications would in any event be irrelevant, because "[u]nder New York's single publication rule, the statute of limitations begins to accrue on the first date of publication." *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 88 (2d Cir.2003).

mary judgment on plaintiffs' claim for defamation and their tortious interference and breach of fiduciary duty claims relating to Solomon's ouster, or the second, third and fifth causes of action alleged in the amended complaint.

### b. Tax Loss Claims

Plaintiffs assert four claims against Siemens (plaintiffs' first, fourth, sixth and seventh causes of action) based upon their contention that Siemens improperly allocated for its own benefit tax losses belonging to Schlesinger, and hence indirectly belonging to FKC. More specifically, plaintiffs claim that Siemens tortiously interfered with FKC's contract with Schlesinger; that Siemens aided and abetted Schlesinger's breach of fiduciary duty to plaintiffs; that Siemens converted the tax losses; and that Siemens was unjustly enriched by its wrongful acquisition of the tax losses.[20] Am. Compl. ¶¶ 64, 67, 69, 70. Defendants seek summary judgment on each of these claims on a variety of grounds.

### 1. Effect of the Settlement Agreement Between Siemens and FKC

■ Defendants first assert that a settlement agreement entered into by FKC and Siemens in 2009 released the tax loss claims because the losses arose before the agreement was signed and because the agreement bars any future as well as all existing claims. Defs. Mem. 11; *see also* Defs. Ex. 34, Docket Entry 134–22 (redacted copy of the settlement agreement).[21] I am not persuaded by Siemens' argument.

Although the settlement agreement is not dated, the parties agree that it was signed on September 23, 2009. Defs. R. 56.1 ¶ 70; Pls. Resp. R. 56.1 ¶ 70. While some of the disputed tax losses had been incurred by that date, the restructuring agreement that allocated all responsibility for the LLC's losses to Siemens was not executed until September 21, 2010. Defs. R. 56.1 ¶ 114. Moreover, Siemens did not file amended tax returns claiming the LLC's losses for itself until July of 2011. Baskinger Decl. ¶ 44, Docket Entry 190.

The relevant clause of the settlement agreement said by defendants to bar plaintiffs' claims based on Siemens' reallocation of tax losses provides that

> Solomon [previously defined as Robert and Jane Solomon and FKC] ... fully and forever unconditionally release ... SE & A and its ... successors ... from

---

**20.** Although they do not fully brief the question, defendants suggest that plaintiffs may be precluded from pressing these claims because of decisions rendered in cases litigated in Queens County and in the Southern District of New York. *See* Defs. Mem. 4–5 (citing *First Keystone Consultants, Inc. v. DDR Constr. Servs.*, No. 05/27095, 25 Misc.3d 1217(A), 2009 WL 3415282 (N.Y.Sup.Ct. Queens Cnty. Oct. 5, 2009); *affirmed in relevant part by* 74 A.D.3d 1135, 904 N.Y.S.2d 113 (2d Dep't 2010); *DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, 770 F.Supp.2d 627 (S.D.N.Y. 2011)) Because I recommend that plaintiffs' claims based on the reallocation of the LLC's tax losses be dismissed for other reasons, I need not decide whether plaintiffs are estopped from claiming that FKC has an interest in SSE's tax losses. If my recommendations on this matter are not adopted, however, I respectfully request the opportunity to revisit this question.

**21.** Because I recommend dismissal of plaintiffs' tax loss claims on other grounds, and because I conclude that the settlement agreement does not bar plaintiffs' claims, I do not consider whether the Settlement Agreement remained in effect even after it was, according to defendants, breached by plaintiffs, or what impact, if any, on the binding effect of the agreement results from Siemens' decision to pay only $575,000 of the $750,000 due under it. Defs. R. 56.1 ¶¶ 106–109, 113. Defendants briefed this question in a supplemental memorandum. Docket Entry 141.

any and all claims ... they ever had or hereafter can, shall or may have for, upon or by reason of or *arising out of any matter[,] cause or thing, whether express or implied, known or unknown* in contract, at common law and /or in equity of whatsoever nature *from the beginning of time through the Execution Date of this Settlement Agreement* ....

Settlement Agreement ¶ 1 (emphasis added). By its plain language, then, the agreement is confined to claims based on matters that had already occurred when the Agreement was executed. At the time the settlement agreement was signed, the Restructuring Agreement had not yet been executed and the amended tax returns had not yet been filed. I therefore conclude that the settlement agreement does not bar plaintiffs from asserting claims based upon the disputed allocation of the LLC's tax losses.

### 2. *Merits of the Tax Loss Claims*

Defendants argue in the alternative that plaintiffs' tax loss claims should be dismissed because the reallocation of the tax losses was proper under the Restructuring Agreement, and would have been consistent with, if not required by, the Internal Revenue Code regardless of whether the Restructuring Agreement had been executed. *See* Defs. Mem. 18–19. Defendants further assert that plaintiffs may not challenge the reallocation of the LLC's losses because they suffered no resulting injury. *Id.* at 21–23. Plaintiffs argue in response that the reallocation of tax losses was improper, required their consent which was neither sought nor obtained, and deprived them of a valuable asset. Pls. Mem. 13–16, Docket Entry 150.

### i. *The Restructuring Agreement*

██ Plaintiffs' claim that it was improper for Siemens and Schlesinger to enter into a Restructuring Agreement that real-

located the LLC's losses to Siemens. Plaintiffs' contention is completely without merit.

First, it is clear that responsibility for LLC's losses is attributed to Siemens under the Restructuring Agreement. Section 1.01(a) of the agreement is captioned "Elimination of SEC's Liability for Losses of the Company," and provides that

SEC [Schlesinger] shall not be responsible or liable for any cost overruns ... losses ... capital calls or contributions.... SEC shall not be responsible to fund or otherwise incur any cost or expense in connection with the Company ... all of which are to be paid in advance or reimbursed entirely by SSE.

Restructuring Agreement, Peluso Ex. 42, Docket Entry 135-7. The agreement goes on to state explicitly in Section 1.01(c) that the allocation of tax losses made in the original operating agreement "shall be adjusted" to provide that Siemens "shall be entitled to all deductions for losses incurred" by the LLC. *Id.* Thus, the Restructuring Agreement indisputably entitled Siemens to file tax returns claiming the losses of the LLC.

Plaintiffs challenge the validity of the Restructuring Agreement, arguing that it could not properly have been entered into without First Keystone's consent. It is undisputed, however, that plaintiffs were not members of the LLC and had no direct rights with respect to agreements made by those who were. It is thus unclear on what basis plaintiffs contend that FKC had any right to object to the execution of the Restructuring Agreement except, perhaps, as a third party beneficiary of the LLC's Operating Agreement. Plaintiffs, though, have explicitly acknowledged that FKC was not a third party beneficiary. Pls. Mem. 25 n. 28, Docket Entry 150. Instead, they argue that the allocation of losses in Restructuring Agreement was

tantamount to a purchase by Siemens of Schlesinger's interest in the LLC's tax losses, and that this purchase was in essence a purchase of Schlesinger's ownership share of SFD, its joint venture with First Keystone. Plaintiffs argue that, because the SFD agreement required First Keystone's approval before Schlesinger could sell its interest in SFD, and because Siemens' reallocation of the LLC's tax losses to itself was the equivalent of a purchase of Schlesinger's interest in SFD, the reallocation could not have been made without First Keystone's consent. Pls. Mem. 10. The problem with this argument is that plaintiffs' contention that the reallocation of responsibility for losses in the Restructuring Agreement was legally equivalent to a purchase of Schlesinger's interest in SFD makes no sense and has no basis. The Restructuring Agreement, while it may have affected the value of Schlesinger's interest in the LLC, and thus the value that Schlesinger contributed as a joint venture partner in SFD, in no way constituted a purchase of anyone's interest in SFD. Indeed, it is undisputed that Schlesinger retained its interest in SFD after the Restructuring Agreement was executed. Thus, plaintiffs' only colorable basis for challenging the Restructuring Agreement would be a claim that its execution violated First Keystone's rights as a third-party beneficiary of the Operating Agreement.

 Even if plaintiffs had asserted that FKC had rights as a third party beneficiary, though, the claim would fail. In support of their position that FKC had a right to object to the Restructuring Agreement, plaintiffs emphasize that First Keystone contributed start-up capital to the LLC (albeit indirectly by contributing capital to SFD) and that First Keystone was entitled to share in Schlesinger's LLC profits (again, indirectly through its inter-

est in SFD). Pls. Mem. 2, 4–6, Docket Entry 150. However, "[t]o succeed on a third-party beneficiary theory under New York law, a non-party must be the intended beneficiary of the contract, not the incidental beneficiary to whom no duty is owed." *Noveck v. PV Holdings Corp.*, 742 F.Supp.2d 284, 295 (E.D.N.Y.2010) (citing *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 252 (2d Cir.2006)). The burden of demonstrating that a non-contracting party was intended to be a third party beneficiary lies with the party asserting third party beneficiary status. *See, e.g., Westport Marina v. Boulay*, 783 F.Supp.2d 344, 350 (E.D.N.Y.2010) (citing *Mendel v. Henry Phipps Plaza W., Inc.*, 6 N.Y.3d 783, 786, 811 N.Y.S.2d 294, 844 N.E.2d 748 (2006)). In this case, not only have plaintiffs not offered any evidence that FKC was the intended beneficiary of the Operating Agreement, but the agreement itself specifically disavows such an intention. The LLC's Operating Agreement includes a section captioned "No Third Party Beneficiaries" that provides, with exceptions not relevant here, that "the parties do not intend to confer any benefit under this Agreement on anyone other than the parties, and nothing contained in this Agreement will be deemed to confer any such benefit on any other person." OA § 18.4, Docket Entry 133–13. Such clauses are dispositive evidence of the intent of Schlesinger and Siemens, the LLC's members. *See India.com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir.2005) (noting that "where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, ... that provision is decisive" (internal citation omitted) and finding that defendant was not a third-party beneficiary, even though other contractual provisions regarding his rights were in tension with the negating clause); *see also 4 Hour Wireless v. Smith*, 2002 WL 31654963, at *1 (S.D.N.Y.

Nov. 22, 2002) (dismissing a third party beneficiary claim because the parties had "clearly stated their intention *not* to benefit third parties" in their contract (emphasis in the original)). It is thus clear that FKC may not challenge the Restructuring Agreement as a third party beneficiary.

### ii. The "Substantial Economic Effect" Rule

█ Even if plaintiffs could successfully attack the validity of the Restructuring Agreement, their challenge to the reallocation of the LLC's tax losses would still fail. This is so because, as is shown below, a review of the applicable Internal Revenue Code provisions, as well as the regulations and case law applying them, demonstrates that Siemens would have been entitled to claim the disputed tax losses even if the Restructuring Agreement had never been adopted.

Although SSE is a limited liability corporation, its profits and losses are properly allocated among its members as if it were a partnership. Pursuant to regulations promulgated under the Internal Revenue Code, "[a] business entity that is not classified as a corporation under" certain provisions of the Code not relevant here "can elect its classification for federal tax purposes.... An eligible entity with at least two members can elect to be classified as either an association [that is, a corporation] ... or a partnership." 26 C.F.R. § 301.7701–3(a); *see also* Baskinger Decl. ¶ 7 (noting that "a multi-member LLC can elect to be treated as a partnership for income tax purposes"). Baskinger's declaration suggests that this election was made; even if it had not been, a domestic eligible entity with two or more members is automatically treated as a partnership unless the entity elects otherwise. 26 C.F.R. § 301.7701–3(b)(i). In line with the

regulations, SSE's tax returns reflect that it is an LLC whose assets and liabilities are to be treated as those of a partnership. Baskinger Decl., Exs. 3–5 (2007 and 2008 amended tax returns, 2009 tax return).[22]

Determining the appropriate distribution of a partnership's tax losses involves an examination of each partner's rights and responsibilities, because "[a] partnership is not subject to Federal income tax.... Rather, the partners are liable for tax in their separate and individual capacities.... Each partner is [thus] required to take into account his distributive share of the partnership's income, gain, loss, deductions, and credits." *Renkemeyer, Campbell & Weaver, LLP v. Comm'r,* 136 T.C. 137, 142–43 (2011). The Internal Revenue Code mandates, in essence, that where the terms of a partnership agreement and the economic reality of how losses and profits are in fact distributed among the partners differ significantly, the allocation of profits and losses for tax purposes is governed by the economic reality rather than the terms of the partnership agreement. Specifically, the relevant Code provision states:

> A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if—
>
> . . .
>
> (2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect.

I.R.C. § 704(b).

█ The term "substantial economic effect" in Section 704(b) "is a term of art and is meant to preclude partnerships from using agreements for gain allocation

---

**22.** *See supra* n. 11.

in order to evade taxes." *Ballantyne v. Comm'r*, 341 F.3d 802, 805 n. 3 (8th Cir. 2003) (citing *Vecchio v. Comm'r*, 103 T.C. 170, 188 (1994)). The pertinent regulations promulgated under the Code require a "two-part analysis" that first examines whether an allocation has economic effect, and then determines whether that effect is substantial. *See* 26 C.F.R. § 1.704–1(b)(2). Generally, an allocation of profits or losses has economic effect if it is "consistent with the underlying economic arrangement of the partners. This means that in the event that there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden." *Id.* § 1.704–1(b)(2)(ii)(a); *see also Estate of Ballantyne*, 341 F.2d at 805 n. 3 (noting that, "to determine whether an allocation has substantial economic effect, the court must determine whether the partner to whom the item is allocated bears the economic burdens and benefits of that allocated item"). An economic effect is substantial if there is "a reasonable possibility that the allocation (or allocations) will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences." *Id.* § 1.704–1(b)(2)(iii)(a).

Courts generally merge the two prongs of the analysis and look to the partners' respective capital accounts to determine their actual interest in the partnership and thus whether the allocations in the partnership agreement reflect financial reality. The U.S. Tax Court has summarized its approach as follows: "if the partnership agreement provides for an allocation that does not have substantial effect, then a partner's distributive share is determined by the partner's interest in the partnership. Determinations of substantial economic effect, as well as determinations of a partner's interest in the partnership, are dependent upon an analysis of the partners' capital accounts." *Estate of Ballantyne v. Comm'r*, 2002 WL 1359741, at *7 (U.S.Tax Ct. June 24, 2002); *see also Ballantyne v. Comm'r*, 341 F.3d at 805 n. 3 (noting that "[t]he test of whether an allocation has substantial economic effect has been called a capital account analysis. ... Under the capital account analysis, the partners must maintain capital accounts, and upon liquidation, distributions must be made according to the positive or negative balances in those capital accounts" (internal citation and quotation marks omitted)).[23]

By 2008, the LLC capital accounts of Schlesinger and Siemens no longer reflected the equal sharing of profits and losses contemplated by the original Operating Agreement, and the allocation under the Operating Agreement therefore ceased to have "substantial economic effect." Janet Baskinger, Siemens' Director of Tax, reports in her declaration that the LLC was originally capitalized with $10,000 in cash, and that Siemens and Schlesinger each contributed another $300,000 during 2006. Baskinger Decl. ¶ 14, Docket Entry 190. By 2008, however, these capital contributions had been depleted. *Id.* ¶ 23. The LLC reported a loss for the tax year ending September 30, 2008, and all of its capital needs during that year were funded by Siemens. *Id.* ¶ 24. The same held true

---

**23.** The Tax Court has also identified the relevant considerations when determining a partner's interest in a partnership as the following: "(a) The partners' relative capital contributions to the partnership; (b) the partners' respective interests in partnership profits and losses; (c) the partners' relative interests in cashflow and other nonliquidating distributions; and (d) the partners' right to capital upon liquidation." *Renkemeyer, Campbell & Weaver, LLP*, 136 T.C. at 144 (internal citations omitted).

during the tax year ending September 30, 2009. *Id.* ¶ 26. Based on this information, Baskinger, in consultation a principal of Siemen's outside accounting firm, determined that it was proper to allocate the entirety of the LLC's losses to Siemens alone. Baskinger Decl. ¶ 34; Harris Decl. ¶¶ 17–18. More specifically, Deanne Harris, the principal of the outside accounting firm consulted by Siemens, states in her declaration that

> The [original] return for the year ending September 30, 2009 had assigned Schlesinger about half of SSE's ... losses for that year, which far exceed[ed Schlesinger's] capital account balance.
>
> Pursuant to the substantial economic effect rule of IRC § 704(b), I concluded that losses in excess of Schlesinger's [capital contributions] would have to have been allocated to Siemens, as I was told that Siemens (and not Schlesinger) had made the economic outlays to keep the SSE enterprise afloat, by obtaining funds from its affiliate Siemens Financial Services, repayment of which was the exclusive responsibility of Siemens.

Harris Decl. ¶¶ 16–17.

Plaintiffs have not presented any evidence calling into question defendants' contention that Siemens "made the economic outlays to keep the SSE enterprise afloat." Nor have plaintiffs submitted any expert declarations suggesting that the allocation of losses to Siemens or the filing of amended tax returns by Siemens claiming those losses was in any way improper.

Plaintiffs seem to argue that the terms of the original Operating Agreement, which imposed financial responsibility for half of the LLC's losses on Schlesinger, themselves had a "substantial economic effect" that should be considered when allocating losses for tax purposes. This argument turns the proper analysis on its head. By relying on the responsibilities imposed

by the terms of the agreement rather than the true economic facts—that is, by relying on what the agreement says rather than what Siemens and Schlesinger actually did—plaintiffs ignore the Code's aim to look beyond the language of an agreement to whether its terms *actually* affect the *dollar amount of the partners' shares* of the total partnership income or loss." *Estate of Carberry v. Comm'r,* 933 F.2d 1124, 1130 (2d Cir.1991) (quoting 26 C.F.R. § 1.704–1(b)(2)) (emphasis added). In any event, the original Operating Agreement explicitly provides that its general provisions calling for the allocation of profits and losses "among the Members equally" are subject to "the adjustments required by the IRC § 704(b) regulations." OA § 5.4(b), Docket Entry 133–13. The terms of the Operating Agreement are therefore not an obstacle to the reallocation of the LLC's losses to Siemens.

Plaintiffs also contend that, despite the fact that Siemens may have covered the expenses and losses of the LLC, certain financial responsibilities were imposed on Schlesinger pursuant to the Operating Agreement that made the reallocation of losses to Siemens—at least in the absence of the Restructuring Agreement—improper. In this regard, plaintiffs invoke 26 C.F.R. § 1.704–1(b)(2)(ii)(c). Pls. Supp. R. 56.1 ¶¶ 75–78; Pls. Mem. 15–16. Section 1.704–1(b)(2)(ii)(c) states as follows:

> If a partner is not expressly obligated to restore the deficit balance in his capital account, such partner nevertheless will be treated as obligated to restore the deficit balance in his capital account ... to the extent of—
>
> ...
>
> (2) The amount of any unconditional obligation of such partner (whether imposed by the partnership agreement or by State or local law) to make subsequent contributions to the partnership

... provided that such ... obligation is required to be satisfied at a time no later than the end of the partnership taxable year in which such partner's interest is liquidated (or, if later, within 90 days after the date of such liquidation). Plaintiffs contend that Section 8.2(e) of the LLC's Operating Agreement imposes an "unconditional obligation" within the scope of Section 1.704–1(b)(2)(ii)(c)(2). Pls. Mem. 17–19. Section 8.2(e) of the Operating Agreement provides that "unanticipated cost overruns" within a member's scope of work will be paid by that member. OA § 8.2(e). Responsibility for an "unanticipated cost overrun," though, is not an "unconditional obligation;" it arises only under the condition that cost overruns occur. Moreover, the regulation by its terms applies only to obligations that must be satisfied no later than the end of the tax year in which a partner's interest is liquidated. There is no indication in the Operating Agreement of any time by which unanticipated cost overruns must be paid. Indeed, Section 5.3(c) of the Operating Agreement, captioned "No Liability for Negative Capital Account," provides that "No Member shall be liable, either before or upon distribution or other termination of the Company, to the Company for its negative Capital Account Balance, if any." OA. Accordingly, the terms of the Operating Agreement, even when considered in light of 26 C.F.R. § 1.704–1(b)(2)(ii)(c)(2), did not impose financial responsibilities on Schlesinger that had a substantial economic effect inconsistent with the reallocation of the LLC's losses to Siemens.

In short, plaintiffs are unable to challenge the validity of the Restructuring Agreement, which plainly allocates responsibility for the LLC's losses to Siemens. Moreover, plaintiffs have failed to identify any evidence raising a material question of fact with respect to the source of the LLC's financing after the original capital contributions made by Siemens and Schlesinger were depleted. Thus, even if the Restructuring Agreement were somehow set aside, the undisputed evidence would establish that Siemens provided all of the LLC's financial support and absorbed all of its losses during the tax years in question. It was therefore proper for the LLC to file amended returns attributing all of its losses to Siemens.

### 3. Causes of Action Based on the Tax Losses

In their first cause of action, plaintiffs allege that defendant Siemens tortiously interfered with the contract between Schlesinger and FKC by "purchasing FKC's "$67,500,000 share of the Tax Losses from Schlesinger." " Am. Compl. ¶ 64. To succeed on a claim for tortious interference with contractual relations, a plaintiff must show: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001) (quoting *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir. 1996)). "[T]o be actionable, the interference must be intentional and not incidental to some other lawful purpose." *Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.,* 887 F.Supp.2d 459, 482 (E.D.N.Y.2012) (quoting *Health–Chem Corp. v. Baker,* 915 F.2d 805, 809 (2d Cir.1990)); *see also Discover Grp., Inc. v. Lexmark Int'l, Inc.,* 333 F.Supp.2d 78, 83 (E.D.N.Y.2004) (noting that "[i]n order to state a claim for tortious interference with contract under New York law, plaintiffs must demonstrate ... [*inter alia*] defendant's intentional procurement of the third-party's breach of the contract *without justification*" (internal citation omitted) (emphasis added)). Plaintiffs have

failed to point to any provision in the agreement forming SFD that Schlesinger breached when it executed the Restructuring Agreement. Moreover, as demonstrated above, the reallocation of the LLC's losses to Siemens was based upon Siemen's assumption of responsibility for those losses and was therefore justified.

■■■ In their fourth cause of action, plaintiffs allege that Siemens aided and abetted Schlesinger's breach of its fiduciary duty to FKC by entering into an agreement with Schlesinger to reallocate the tax losses. A claim for breach of fiduciary duty is stated under New York law when a fiduciary duty exists between the plaintiff and another entity, that entity breaches the duty, and the plaintiff sustains damages. *See Sheehy v. New Cent. Mortg.,* 690 F.Supp.2d 51, 62 (E.D.N.Y.2010) (citing *Meisel v. Grunberg,* 651 F.Supp.2d 98, 114 (S.D.N.Y.2009)). If a breach of fiduciary duty has in fact taken place, a defendant may be held liable for aiding and abetting that breach if it "knowingly induced or participated in the breach, and . . . [the] plaintiff suffered damage as a result of the breach." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 294 (2d Cir. 2006) (quoting *Kaufman v. Cohen,* 307 A.D.2d 113, 125, 760 N.Y.S.2d 157 (1st Dep't 2003)). The undisputed evidence here indicates that the tax losses at issue were reallocated to Siemens because Schlesinger lacked the funds to keep the LLC running. Plaintiffs never explain or demonstrate what duty Schlesinger had that it breached when it reached the apparently reasonable agreement that Siemens would take responsibility for funding the LLC's operations, but would thereby acquire the right to claim its losses for tax purposes. Moreover, as discussed below, even if plaintiffs could establish the breach of a fiduciary duty, they could not establish

that they suffered any damages as a result of the reallocation of the LLC's losses.

■■■ Plaintiffs' sixth cause of action asserts a claim for conversion. Under New York law, conversion is "the exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession." *Citadel Mgmt. v. Telesis Trust, Inc.,* 123 F.Supp.2d 133, 147 (S.D.N.Y. 2000) (quoting *LoPresti v. Terwilliger,* 126 F.3d 34, 41 (2d Cir.1997)). Plaintiffs never held legal title to the tax losses of the LLC. Moreover, because Siemens legitimately acquired the right to claim those losses, plaintiffs did not have a "superior right of possession" to them.

■■■ Plaintiffs' seventh cause of action asserts a claim of unjust enrichment. A claim of unjust enrichment under New York law requires a demonstration "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Barbagallo v. Marcum LLP,* 820 F.Supp.2d 429, 443 (E.D.N.Y.2011) (quoting *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000)). Here, as explained below, the LLC's tax losses would have had no value to plaintiffs, and their reallocation therefore may not be said to have occurred at "plaintiff's expense." Moreover, because the reallocation of the losses was proper, "equity and good conscience" do not "require restitution." Finally, "the existence of a valid written contract generally precludes proceeding on grounds of unjust enrichment." *Id.* (internal citation omitted). Here, the rights and obligations at issue are set forth in the SFD Agreement, Peluso Ex. 5, Docket Entry 133-9, as well as the LLC's Operating Agreement and Restructuring Agreement. The existence of these contracts precludes any unjust enrichment claim.

Finally, even if plaintiffs could otherwise successfully assert a cause of action challenging the reallocation of the entirety of the LLC's tax losses to Siemens, defendants would be entitled to summary judgment because plaintiffs are unable to establish that they were damaged as a result. It is undisputed that, during the relevant tax years, FKC had no income that could have been offset with a tax loss. Defs. R. 56.1 ¶¶ 120–124; Pls. Resp. R. 56.1 ¶¶ 120–124 (admitting that FKC has no assets with the exception of its asserted interests in SFD and SSE and operating income). Indeed, at the time the Restructuring Agreement was executed, First Keystone already had substantial losses it could have used to offset income if it had any. Defs. R. 56.1 ¶ 125; Pls. Resp. R. 56.1 ¶ 125.

For all these reasons, I respectfully recommend that summary judgment be granted in favor of the defendants on each of plaintiffs' claims related to the LLC's tax losses, or the first, fourth, sixth and seventh causes of action in plaintiffs' amended complaint.

### c. Claims Against Defendant Manatt

Plaintiffs have brought a number of claims against Manatt, counsel to defendant Siemens. Specifically, in their eighth, ninth, tenth and eleventh causes of action, plaintiffs allege that Manatt aided and abetted the tortious interference with contract, breach of fiduciary duty, and conversion they attribute to Siemens, and were unjustly enriched as a result. See Am. Compl. ¶¶ 71–74. Plaintiffs' primary factual allegations against Manatt involve the firm's role in drafting the Restructuring Agreement with the alleged knowledge that it was assisting Siemens in commandeering FKC's property by reallocating the LLC's tax losses. See id. ¶¶ 46–48, 59–60.

In order "[t]o establish an aiding and abetting claim, a plaintiff must adequately plead '(1) *the existence of a violation by the primary wrongdoer;* (2) knowledge of this violation on the part of the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer.'" *In re Refco Sec. Litig.,* 759 F.Supp.2d 301, 333 (S.D.N.Y. 2010) (quoting *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F.Supp.2d 536, 546 (S.D.N.Y.2007)) (emphasis added). Because I recommend that summary judgment be entered against plaintiffs on their claims of tortious interference with contract, breach of fiduciary duty, conversion, and unjust enrichment against Siemens, I recommend that plaintiffs' aiding and abetting claims against the law firm be dismissed as well. *See id.* at 332 (ruling that because plaintiff "failed to plead the primary wrong of conversion . . . any claim against the [defendants] for aiding and abetting conversion should be dismissed"); *WIT Holding Corp. v. Klein,* 282 A.D.2d 527, 529, 724 N.Y.S.2d 66 (2d Dep't 2001) (finding that "[a]s there [was] no cause of action to recover damages for breach of fiduciary duty, the plaintiff's cause of action . . . for aiding and abetting a breach of a fiduciary duty should also have been dismissed" by the lower court).

### d. Other Non–Viable Claims

#### 1. Punitive Damages and Conspiracy

Plaintiffs' twelfth and fourteenth causes of action purport to state claims against all defendants for conspiracy and punitive damages, respectively. Am. Compl. ¶¶ 75, 77. As defendants note, however, New York common law does not recognize an independent cause of action for either punitive damages or conspiracy. *See Excelsior Capital LLC v. Allen,* 2012 WL 4471262, at *7 (S.D.N.Y. Sept. 26, 2012) (observing that "[p]unitive damages

are not a separate cause of action" but rather may be "available as a remedy in cases of egregious wrongdoing that is punishable as some other type of claim for relief"); *Drake v. Lab. Corp. of Am. Holdings*, 2007 WL 776818, at *4 (E.D.N.Y. Mar. 13, 2007) (noting that "[u]nder New York law, [a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort" (internal quotation marks and citation omitted)). Although defendants seek dismissal of plaintiffs' twelfth and fourteenth claims on this basis, courts do not generally dismiss assertions of entitlement to punitive damages or conspiracy simply because they are pled as stand-alone claims. Instead, a "cause of action" for punitive damages may be interpreted as a demand for punitive damages on other, properly pled causes of action. *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs.*, 871 F.Supp. 709, 732 (S.D.N.Y.1995). Similarly, "allegations of conspiracy enable a plaintiff, who has pleaded specific acts that form the basis of an independent tort, to show that the acts complained of flow from a common scheme or plan." *In re Houbigant, Inc.*, 1996 WL 527334, at *7 (S.D.N.Y. Sept. 16, 1996) (citing *Innovative Networks, Inc.*, 871 F.Supp. at 731). Thus, although plaintiffs' claims for conspiracy and punitive damages may not stand as independent causes of action, I might recommend that they be permitted to serve as allegations seeking relief or apportioning liability if I found that other claims asserted by plaintiffs could survive defendants' motion. However, because I recommend that each of plaintiffs' other claims be dismissed, I also recommend dismissal of plaintiffs' twelfth and fourteenth causes of action.

### 2. *Intentional Infliction of Emotional Distress*

 Plaintiffs' thirteenth cause of action asserts a claim against all defendants for intentional infliction of emotional distress. Am. Compl. ¶ 76. A party asserting a claim for intentional infliction of emotional distress must establish: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Vumbaca v. Terminal One Grp. Ass'n, L.P.*, 859 F.Supp.2d 343, 377 (E.D.N.Y.2012). The claim "is an extremely disfavored cause of action. To prevail, plaintiff must prove extreme and outrageous conduct that transcends all bounds of decency, and that is regarded by civilized society as atrocious and utterly intolerable." *Durant v. A.C.S. State & Local Solns., Inc.*, 460 F.Supp.2d 492, 499 (S.D.N.Y.2006) (internal citation omitted); *see also Elmowitz v. Exec. Towers at Lido, LLC*, 571 F.Supp.2d 370, 378 (E.D.N.Y. 2008) (noting that, as of the date of the opinion, not a single intentional infliction of emotional distress claim had survived scrutiny by the New York Court of Appeals); *cf. Koulkina v. City of New York*, 559 F.Supp.2d 300, 324 (S.D.N.Y.2008) (discussing several cases in which lower New York courts found that the conduct at issue was sufficiently outrageous to sustain a claim for intentional infliction of emotional distress, including one "where, during a live radio broadcast, defendant allegedly handled and made disrespectful comments about the cremated remains of plaintiff's sister" (internal citations omitted)).

 It is abundantly clear that, even if plaintiffs' claims could otherwise withstand defendants' motion, the conduct of defendants alleged by plaintiffs would not meet the level of egregiousness contemplated by a claim of intentional infliction of emotional distress. The evidence demonstrates that plaintiffs' claims involve, in essence, a com-

mercial dispute among companies engaged in business together and the tensions and finger-pointing that inevitably arises when profits are anticipated but losses ensue. This is simply not the stuff of "extreme and outrageous conduct that transcends all bounds of decency, and that is regarded by civilized society as atrocious and utterly intolerable."

██ Moreover, the limitations period applicable to claims for intentional infliction of emotional distress is one year. *Cabrera v. Quik Park Columbia Garage Corp.*, 2000 WL 1897348, at *1 (E.D.N.Y. Dec. 18, 2000) (noting that "[i]t is well-established under New York law that a claim of intentional infliction of emotional distress has a one-year statute of limitations") (collecting cases); *accord Patterson v. Balsamico*, 440 F.3d 104, 112 n. 4 (2d Cir.2006) (noting that "New York courts have held that a claim for damages for intentional infliction of emotional distress is subject to the one-year statute of limitations in C.P.L.R. Section 215(3)" (internal citations omitted)). Plaintiffs' thirteenth cause of action does not specify which of the alleged wrongs perpetrated by defendants form the basis for their intentional infliction of emotional distress claim. However, their claim is, for reasons discussed above, time barred to the extent it is based upon the ouster of Robert Solomon from the LLC board or upon the alleged defamation of Solomon by Krutemeier. To the extent plaintiffs' claim is based on the reallocation of the LLC's tax losses from Schlesinger to Siemens, I have already explained my reasons for concluding that the reallocation was proper. Accordingly, for all these reasons, defendants' motion for summary judgment on plaintiffs' claim for intentional infliction of emotional distress should be granted.

### e. *Plaintiffs' Motion to Unseal*

Plaintiffs have also moved to unseal each of the documents submitted in connection with defendants' motions for summary judgment. Docket Entry 180. For the reasons stated below, plaintiffs' motion is denied.

A large number of documents have been filed under seal or with redactions both in support of and opposition to defendants' motion for summary judgment. I have previously examined the scope of defendants' filings made under seal in the case. *See* Order dated Aug. 31, 2012, at 2 n. 2, Docket Entry 186 (ordering that, "[t]o the extent … there remains non-confidential information submitted in support of the summary judgment motion that is not publicly available, defendants shall publicly file such documents, redacted where necessary"); Order dated Dec. 19, 2012, at 2, Docket Entry 188 (ordering that defendants resubmit certain documents relevant to the disposition of the summary judgment motion with more limited redactions or provide briefing on why they should not be ordered to do so). Responding to these orders, defendants have publicly filed redacted versions of documents originally submitted under seal and, in some instances, have submitted second versions of previously filed documents with fewer redactions. Docket Entries 187, 189–92.

██ As a result, the overwhelming majority of documents submitted by defendants that remain completely under seal are tax returns or summaries of the Solomons' taxable income that were provided by plaintiffs in response to defendants' interrogatories. Tax returns are generally afforded special protection from public disclosure. *See, e.g., Carmody v. Village of Rockville Ctr.*, 2007 WL 2042807, at *2 (E.D.N.Y. July 13, 2007) (citing *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 119 F.R.D. 625, 627

(E.D.N.Y.1988)). Moreover, in this case, the sealed returns are merely corroborative of expert reports filed publicly with limited redactions. Docket Entries 190–91.

Similarly, the documents plaintiffs have filed to oppose summary judgment that remain under seal are either tax returns, internal communications regarding the Restructuring Agreement or the tax return amendments (none of which contradict the expert declarations publicly filed), or wholly irrelevant to the disposition of the summary judgment motion. As with the documents submitted by defendants, I have previously had occasion to examine the filing of multiple documents subject to a stipulation of confidentiality by plaintiffs. *See* Order dated Aug. 31, 2012, Docket Entry 186. As I noted at that time, consideration of whether the seal in this case should be lifted is complicated by the fact that "plaintiffs have employed litigation tactics in this and a related case before this Court that have already been found not to have been entirely proper." *Id.* at 3 (citing related case *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.,* 862 F.Supp.2d 170, 195 (E.D.N.Y.2012)). The concern I expressed then is heightened now that I have reviewed the parties' motions, and it has become clear that many of the documents filed by plaintiffs with the Court have no apparent relevance to the arguments made by the parties in connection with the pending motions. For example, plaintiffs have filed information about SSE's implemented or planned construction projects. These documents arguably illustrate how the LLC came to be losing money, or the roles Schlesinger and Solomon were expected to play in SSE's work. As this Report makes clear, however, these details have no bearing on the current economic reality of the LLC and resulting tax loss reallocations or any other issue raised by the pending mo-

tions. I am thus left with serious concerns about plaintiffs' motive for filing large numbers of apparently irrelevant confidential documents with the Court.

Plaintiffs' most compelling argument for unsealing these documents is the Second Circuit's holding in *Lugosch v. Pyramid Company of Onondaga,* 435 F.3d 110 (2d Cir.2006). The Court there stated that "documents submitted to a court in support of or in opposition to a motion for summary judgment are judicial documents to which a presumption of immediate public access attaches." *Id.* at 126. Nevertheless, I do not read the Second Circuit's opinion in *Lugosch,* which was written in response to long-pending requests of media outlets for documents of potential public importance, as an invitation to litigants to file an adversary's irrelevant confidential documents as a way of avoiding a confidentiality stipulation into which they entered. The documents in this case all appear to have been produced pursuant to such a stipulation, Docket Entry 49–1, and plaintiffs should not lightly be freed of the commitments they made when the stipulation was entered. This is particularly so when plaintiffs have previously transgressed the bounds of that stipulation by attempting to use documents produced in this case under a stipulation of confidentiality in another litigation. *See First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.,* No. 10–CV–696, Docket Entry 164, at 5–8, 2013 WL 950573 (E.D.N.Y. Mar. 12, 2013) (Matsumoto, J.).

Even if the presumption described in *Lugosch* applied with full force under these facts, this Court would still be required to balance "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." 435 F.3d at 119 (quoting *United States v. Amodeo ("Amodeo II"),* 71

F.3d 1044, 1049 (2d Cir.1995)). As discussed above, the documents at issue do not bear upon the recommendations made in this Report, and no third party has sought their disclosure. Indeed, plaintiffs are the only ones seeking disclosure, and they already have access to the documents. Thus, the documents played no significant role in the exercise of judicial power and there has been no interest in the documents by those who may be monitoring the courts. Plaintiffs' motion is accordingly denied.

## CONCLUSION

For the reasons stated above, plaintiffs' motion to unseal is denied. Moreover, I respectfully recommend that defendants' motions for summary judgment be granted in their entirety and that all claims against the defendants be dismissed, and that plaintiffs' cross-motion for summary judgment be denied.

Any objections to the recommendations made in this Report must be made within fourteen days after service of the Report and, in any event, no later than July 8, 2013. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989) (discussing waiver under the former ten-day limit).

Signed June 21, 2013.